THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN L. BRYANT *et al.*, Defendants-Appellants.

Fifth District    Nos. 5—06—0573, 5—06—0598 cons.

Opinion filed April 30, 2009.

E. Joyce Randolph and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant John L. Bryant.

Ira H. Fertel and William A. Schroeder, both of Carbondale, for appellant Lisa Bryant.

Michael L. Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE WEXSTTEN delivered the opinion of the court:

In June 2006, following a joint jury trial in the circuit court of Jackson County, defendant John L. Bryant was convicted of first-degree murder (720 ILCS 5/9—1(a)(1) (West 2004)) and concealment of a homicidal death (720 ILCS 5/9—3.1(a) (West 2004)), and his wife, defendant Lisa Bryant, was convicted of first-degree murder under a theory of accountability (720 ILCS 5/5—2(c), 9—1(a)(1) (West 2004)). On appeal, the defendants argue, *inter alia*, that their convictions should be reversed because their trial attorney was ineffective for failing to call witnesses in support of their defense. We agree.

## BACKGROUND

The following facts are relevant to the disposition of this appeal. Christopher Gandy, a 23-year-old black male from Chicago, was an undergraduate student at Southern Illinois University at Carbondale who dealt cocaine. On the morning of January 28, 2006, Gandy's burnt car and burnt corpse were discovered in a cemetery south of Murphysboro. An autopsy revealed that he had been stabbed numerous times about the face and chest and had been repeatedly struck in the head with what could have been a wrench or a pipelike object. No fractures to his skull were observed. The official cause of Gandy's death was exsanguination, *i.e.*, blood loss, and the death was ruled a homicide. An investigation led authorities to four suspects: Rocky Maki, Jeffery Holt, and the defendants. The defendants and Maki were subsequently charged with Gandy's murder, but in exchange for his promise to testify against the defendants, Holt was not.[1]

The defendants were arrested at a hotel in Carbondale on the afternoon of January 28, 2006. When questioned by investigators, both defendants asserted that they had not murdered Gandy, and although they indicated that they were aware that something had happened to him, they refused to give statements regarding what they knew. During the interviews, investigators suggested several hypothetical scenarios regarding what might have led to Gandy's murder, but their efforts to elicit incriminating statements failed. At one point, Lisa did ask if Illinois had the death penalty, and when asked what

---

[1]Maki did not testify at the defendants' trial, advising through counsel that, if called as a witness for either side, he would exercise his fifth amendment privilege against self-incrimination. See U.S. Const., amend. V.

should happen to whoever had killed Gandy, she stated that they should receive "[a] lot of rehab." Gandy's blood was discovered in the defendants' living room and on their back patio. Gandy's blood was also discovered on Maki's shoes. Gandy's driver's license was found in the pocket of a jacket in the defendants' kitchen.

At the defendants' trial, the State's theory of guilt was that Maki and the defendants had lured Gandy to the defendants' residence, where he was battered severely and robbed of his cocaine and cash. He was then left for dead in the trunk of his car, and the car was abandoned at the cemetery. Concerned that Gandy's car contained physical evidence that could be used to connect them to the crime, the defendants later returned to the cemetery to burn the car. When they arrived, they found Gandy alive and sitting in the driver's seat of the car. Gandy was subsequently stabbed, and his car was set on fire. At the trial, the only direct evidence supporting the State's case against the defendants came from Holt, who testified that he was present when the events in question unfolded.

In his opening statement to the jury, defense counsel asserted that, although the defendants were cocaine addicts who had sometimes purchased cocaine from Gandy, they had absolutely nothing to do with his murder. Counsel maintained that Holt and Maki had killed Gandy while the defendants were asleep in their bedroom and that Holt had later awoken them, shown them that there was blood in their house, and told them what had happened. Counsel stated that the defendants subsequently went to a hotel because they needed time to rest and think. Counsel repeatedly advised the jury that the defendants would testify to what really happened on the night in question and, at one point, stated the following: "My clients will testify in this trial, make no bones about it. We know you want to hear it from their mouths. We will let them tell you, in the Defense's case, exactly what they did, and you will make up your mind[s] then, by listening to all of the evidence and by listening to their side." Counsel then set forth in detail what the defendants' testimony would purportedly establish. Counsel suggested that the jury would also hear evidence that, after the defendants had been arrested, Maki and Holt met at Wal-Mart to discuss what they were going to tell the police. Counsel further suggested that the jury would hear evidence that, after the murder, Maki had been seen with a collapsible baton and had bragged to several people that he had killed Gandy with it. Counsel maintained that the physical evidence implicated Maki and Holt but did not implicate the defendants. Counsel repeatedly asked the jury to reserve judgment until it had heard all the evidence.

At the trial, Holt testified that he was a drug addict who had often obtained drugs from the defendants. He testified that, on the night of January 27, 2006, he and Maki went to the defendants' residence hoping to exchange a television and a DVD player for some drugs. Bryan Bruce testified that he was also present at the time and was wanting to purchase some cocaine. Bruce and Holt both testified that Lisa called Gandy and told him that she and John needed to meet with him. Gandy subsequently arrived with a large quantity of cocaine and sold some to Bruce but was not interested in trading any for the television and DVD player. Gandy then left, and after sharing some of his cocaine with the defendants as payment for brokering his purchase, Bruce left as well.

Holt testified that after Gandy and Bruce left, John began complaining because Gandy would not advance him any cocaine. Holt testified that the defendants and Maki then agreed that they should just take Gandy's cocaine and that Lisa called Gandy back and told him that she and John would trade their flat-screen television for some cocaine. Gandy agreed to come back and make the trade. Holt testified that while awaiting Gandy's return, John stated that they were going to hit Gandy in the back of the head to knock him out. Holt stated that John had handed him a small crescent wrench to use as a weapon and that he agreed to hit Gandy with it. John was armed with a larger crescent wrench. Gandy returned and while he was inspecting the defendants' flat-screen television, John nodded at Holt to hit Gandy. Holt testified that he ignored John and would not do it. John then struck Gandy in the back of the head with the larger wrench. Gandy fell to the floor, and Maki took his cash, cocaine, and car keys. When Gandy moved, John hit him again and then drug him from the living room outside to the back patio. Once outside, John struck Gandy in the head with several flowerpots. Holt testified that he pleaded with John to stop. Maki then began punching and kicking Gandy, and John struck Gandy in the head with a large rock. John and Maki then placed Gandy into the trunk of Gandy's car, and John drove the car to the cemetery. Maki and Holt followed in Maki's car. Holt testified that, before abandoning Gandy's car, John had struck Gandy in the face with a floor jack that was lying in the trunk. John, Holt, and Maki then went to Motomart and purchased cigarettes and fuel for Maki's car. Holt testified that John and Maki also split up Gandy's money at Motomart. The three men then returned to the defendants' house, where Gandy's cocaine was divided between the defendants and Maki. Maki then left. Holt testified that he remained at the house at John's insistence and that he and the defendants smoked most of the defendants' share of Gandy's cocaine. Maki later returned and asked Holt if he wanted to leave with him, but Holt declined.

Holt testified that when the defendants became concerned that the police might be able to recover fingerprints from Gandy's car, the defendants decided to burn the car, so he and the defendants drove back to the cemetery in the defendants' truck with some lighter fluid. When they arrived, they saw that Gandy had escaped from the trunk of the car and was sitting in the driver's seat. John unsuccessfully tried to light the car on fire with the lighter fluid and a lighter. Holt testified that he and the defendants then returned to the defendants' residence, where John retrieved a propane torch and a knife. Lisa then dropped Holt and John off at the cemetery, where John stabbed Gandy numerous times and lit the car on fire with the torch. Holt testified that Lisa came back later and picked up him and John and that they returned to the defendants' house and smoked the remainder of their cocaine. Holt testified that the defendants talked about possibly leaving town, that he and the defendants subsequently went to Motomart and purchased cigarettes and fuel for the defendants' truck, and that they then drove to Marion, where they unsuccessfully attempted to obtain more cocaine. After returning to the defendants' residence, Lisa cleaned up the living room and John cleaned up the back patio.

Holt testified that the defendants dropped him off at his house between 7 and 8 a.m on the morning of January 28. When he entered his home, Maki was asleep on the couch. Holt testified that the following day, investigators contacted him about Gandy's murder, and he told them that he had never seen a "black man" at the defendants' house. He also claimed that he had never purchased drugs from the defendants. When interviewed again in February, he denied having any information about Gandy's murder. Holt testified that he lied to the investigators because he was afraid of John. In March, Holt provided an investigator with "bits and pieces" of what he knew. Holt testified that he had not struck or stabbed Gandy and that he had not set Gandy's car on fire.

Holt was thoroughly cross-examined by defense counsel, and he admitted, *inter alia*, that he had thrown away the jacket that he had worn on the night in question because it had Gandy's blood on it. He also admitted that he had told the police that a female was in the car when he and Maki were at Motomart on the night of January 27. Holt acknowledged that, in exchange for his testimony against the defendants, he was not going to be charged with Gandy's murder. Holt denied that at the time he was questioned by the police he was aware that John had been arrested. When counsel asked Holt whether he and Maki had met at Wal-Mart to discuss what they were going to tell the police, the State objected to counsel's inquiries on the basis that

they were beyond the scope of the direct examination, and the trial court sustained the objections. Similar objections were sustained when counsel asked Holt if he had "described to [the police] how [he] and [Maki] had gone to other dealers to rip them off for money" and if he had told the police that he had stolen "weed and money from a dealer in Carbondale."

Lisa's sons testified that Lisa had briefly visited them on the night of January 27 around midnight. She appeared scared and upset but would not tell them what was wrong. The following day, they met the defendants at a hotel in Carbondale, and Lisa told them that she had to leave town for a while. John's sister, Kerri Gregory, testified that Lisa had told her that "something bad had happened" and that she and John "were going to leave town until things got straightened out."

Jo Lynn Stearns testified that she had seen Maki at a party in Murphysboro on the night of January 27, 2006. Stearns stated that Maki had bloodstains on his pants.

Andrea Harker testified that she also saw Maki on the night of January 27. Harker stated that Maki had given her $30 that he owed her and that he had also given her and her friends a small amount of cocaine from a large bag of cocaine that he had. On cross-examination, when counsel asked Harker whether she had later seen Maki on January 29, the State objected to the question on the ground that it was beyond the scope of direct. The trial court sustained the State's objection, and in the presence of the jury, defense counsel stated, "I'll ask that question when we recall her in our case, Judge."

Holt's father, Warren, and Warren's neighbor, Stacey Franklin, testified and corroborated Holt's claim that the defendants had dropped him off at his house on the morning of January 28. Warren also testified that he had seen Maki the night before and that it appeared as if Maki had been injured. Maki told Warren that he had been in a motorcycle accident. On cross-examination, defense counsel asked Warren whether he had told investigators that, a few days after Gandy's murder, he had seen Maki with a collapsible baton and that Maki was "bragging about beating some nigger to death." The State objected to the line of questioning on the ground that it was beyond the scope, and the objections were sustained. The court then admonished the jury to disregard the questions, and the court ordered the parties into chambers. In chambers, the court advised defense counsel to discontinue his efforts to introduce defense evidence through his cross-examination of the State's witnesses. The court told counsel that he could call Warren in his case in chief and ask him about what he knew about Gandy's murder. Noting that the right way

to introduce evidence was not necessarily "the easiest way," the court explained that cross-examination was limited to matters covered during direct examination. In response, defense counsel complained that the court was unduly restricting his cross-examination. Thereafter, in the presence of the jury, counsel stated, "I'll reserve my questions when we recall [Warren] in our defense's case in chief." During a subsequent break in the proceedings, the court again admonished defense counsel about his attempts to present evidence through his cross-examination of the State's witnesses.

Frederick Pendleton testified that he was working at the Murphysboro Motomart on the morning of January 28, 2006, and that at approximately 5 a.m. John came into the store and bought a lighter and a pack of cigarettes. Pendleton stated that John was "a little bit dirty" and smelled like a campfire. The store's video surveillance system recorded John's early morning purchase, and the video was shown to the jury. The jury also saw a video of Maki, Holt, and an unidentified third person at Motomart the night before.

Pete Sopczak of the Illinois State Police testified that he had assisted in the investigation of Gandy's murder by photographing and processing the defendants' residence and the cemetery where Gandy's car and body had been found. Sopczak testified that no blood was recovered from the defendants' truck. When defense counsel asked Sopczak on cross-examination whether he had gathered any evidence at a "burn pile," the State objected to the inquiry on the ground that it was beyond the scope of the direct examination. When the trial court sustained the objection, defense counsel stated, in the presence of the jury, "Well, Your Honor, then I reserve the right to recall this witness in my case." When defense counsel subsequently asked Sopczak to identify a photograph of the burn pile, the trial court sustained the State's objection and, in chambers, again admonished counsel to stop attempting to introduce the defendants' evidence through his cross-examination of the State's witnesses.

Detective Michael Ryan of the Jackson County sheriff's department testified regarding his involvement in the investigation of Gandy's death. When cross-examined, Ryan acknowledged that, "later in the investigation," both Maki and Holt had stated that John had struck Gandy with a wrench. When defense counsel asked whether Maki and Holt had met at Wal-Mart following the defendants' arrests, the State objected to the question as being beyond the scope of direct. After the court sustained the objection, defense counsel requested to be heard outside the presence of the jury. In chambers, counsel again complained that his cross-examination was being unduly limited. In response, the trial court again explained that the questions counsel

was posing were beyond the scope of the State's direct examination and were thus improper questions to ask on cross-examination. The court then invited counsel to call Ryan in the defendants' case in chief if he so chose. Thereafter, the following occurred in the presence of the jury:

"[Defense counsel]: Mr. Ryan, will you be available to testify in my case in chief?

[Detective Ryan]: Yes, sir, I will.

[Defense counsel]: All right. I'll reserve the rest of my questioning for that time. Thank you."

At the end of the final day of the State's presentation of evidence, the State advised the court that it would rest its case against the defendants the following morning, and defense counsel indicated that he would have his witnesses ready at that time. The next day, however, after the State rested, the defense rested without presenting any evidence.

In its closing argument to the jury, the State maintained that Holt was a believable witness because his story had been corroborated in several respects. The State also noted that Holt's account of Gandy's death was uncontradicted and that the case against the defendants had to be judged on the evidence presented at the trial and "not the wild suppositions of the defense."

In the defendants' closing argument, defense counsel stated the following:

"Ladies and gentlemen, there's so much information in this case it's difficult for a lawyer to know where to start, but I'll start with this. When I gave my opening statement I told you we had a simple defense, and it hasn't changed. They were present together at their residence, my two clients, and they were in their bedroom when the victim was struck, assaulted by Holt and Rocky Maki. They did not see what had happened to him at their house, and they didn't see what happened to him at the cemetery where he was finished off. They only knew what Holt had told them in the middle of the night when he returned.

The defendants were arrested when they were still trying to make sense of what had happened and what they should do. And they did not know what had happened to Christopher Gandy at that point, because they weren't there in the cemetery, and there's no believable evidence that they were there."

As for his failure to present any evidence, defense counsel stated: "I'll hope you forgive me for not extending the trial about another week and not putting on any evidence. I ask you not to hold that against my clients[;] that is my decision, because I thought we've had enough." Maintaining that the State had failed to prove the defendants' guilt

beyond a reasonable doubt, counsel argued that "all of the alleged evidence to support this case comes out of the mouth of Jeff Holt," who counsel referred to as a "story maker." Counsel assailed Holt's testimony as consisting of self-serving fabrications and emphasized that the evidence had established that Gandy's blood was only present on the clothing worn by Holt and Maki and that no blood was observed anywhere in the defendants' truck. Counsel also argued that if Holt's account of the events in question were true, Gandy would have sustained skull fractures. Noting that the blood found in the defendants' living room was near the back door and that the back door was "as far away as you can get from the bedroom as possible," counsel again argued that the defendants were in the bedroom when the murder occurred. Emphasizing that "the bedroom is on the opposite corner" of the back patio, counsel suggested that Maki and Holt were able to beat Gandy outside while the defendants slept. Counsel noted that the Motomart video taken on the night of January 27 showed Maki and Holt together but did not show that John was with them, as Holt had contended. Counsel argued that the injuries to Gandy's head were made with a "pipelike object," but Maki and Holt "had a plan to say that [John] hit [Gandy] with a wrench." Counsel argued that Maki and Holt had killed Gandy for his cocaine and that they had discussed the "story they were going to tell" when they met at Wal-Mart following the defendants' arrests. In response to numerous objections by the State that counsel was arguing facts not in evidence, the jury was repeatedly admonished that closing arguments are not evidence and that statements not based on evidence should be disregarded.

In rebuttal, the State argued, "To find the defendants not guilty would require you to ignore all of the uncontroverted uncontradicted evidence that has been presented to you over the past three weeks," and the State suggested that defense counsel was attempting to confuse the jury with "speculation" and "guesswork." The State also noted that there was "no evidence, whatsoever, that [the defendants were] in the bedroom" when Gandy was attacked in their home.

In September 2006, the trial court held a hearing on the defendants' posttrial motions, and when called by the State, defense counsel testified at the hearing. In response to the allegation that he was ineffective for failing to call any witnesses for the defense, defense counsel explained that he was "able to elicit on cross[-]examination that which [he] would have elicited on direct examination had [he] called [the State's] witnesses." He was thus "able to get the information from the State's witnesses that [he and the defendants] wished to use in [their] closing argument." Counsel stated that many of the 15 defense

witnesses he had subpoenaed were also witnesses for the State, and he specifically defended his decision not to call Holt and Warren as witnesses for the defense. Referring to his decision to not call Warren as a witness, counsel maintained that although Warren would have testified that he heard Maki say that he had beaten Gandy to death, "it was perfectly clear that [the defense] theory was that the two murderers were Jeff Holt, [the] State's star witness, and Rocky Maki, rather than either one of the [defendants]." Counsel also indicated that a pretrial ruling "precluded [him] from bringing that hearsay statement in." Counsel testified that he did not call Holt as a witness because he had successfully impeached him and that "there was nothing to be gained for the defense" by calling him. With respect to the failure to call the defendants after promising the jury that they would testify, counsel stated that the State's evidence had provided "almost every element of [the defense] theory." Noting that "the [defense] theory was not abandoned," counsel reiterated that he was able to "make the closing argument that [he] made." Counsel also stated that by not calling the defendants as witnesses, he avoided subjecting them to cross-examination and further avoided the possibility that the State might elicit damaging rebuttal testimony. Counsel testified that he believed that the State's case was "ridiculously inadequate," that he was able to bring out the inadequacies through his cross-examination of the State's witnesses, and that he was able to make "the closing argument that [he] wanted to make." Counsel acknowledged that during the course of the trial, when many of his questions were objected to on the ground that they were beyond the scope of the State's direct, the trial court had sustained the objections and had advised him that the proper way to introduce the evidence that he had attempted to elicit was to present it in his own case in chief. Counsel testified that he "made [the] decision along with [his] clients not to call [any witnesses]," but he subsequently stated that "it was [his] decision not to put on [any] evidence." Counsel also stated that he believed that not putting on any evidence "was in the best interest of [his] clients."

When denying the defendants' posttrial motions, the trial court concluded that defense counsel had conducted a "significant and meaningful adversarial testing" of the State's case. The court also stated that counsel had effectively cross-examined the State's witnesses and had elicited "significant admissions" from Holt.

At sentencing, the defendants maintained their innocence and asserted that Holt and Maki were responsible for Gandy's death. Lisa also contended that she "didn't know [defense counsel] was going to give up on [the] case and not put up a defense." The present appeals followed.

## ANALYSIS

■ The defendants argue, *inter alia*, that their convictions should be reversed because their trial attorney was ineffective for failing to call any witnesses in support of their defense. The defendants maintain that counsel's failure in this regard was especially prejudicial in light of his opening statement to the jury.

To succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). "Under *Strickland*, a defendant must prove not only that defense counsel's performance fell below an objective standard of reasonableness, but also that this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different." *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000).

"Although counsel's decision regarding whether or not to present a particular witness is generally a matter of trial strategy [citation], counsel may be deemed ineffective for failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999). Counsel may also be deemed ineffective "if he promises that a particular witness will testify during his opening statement but does not provide the promised testimony during trial." *People v. Ligon*, 365 Ill. App. 3d 109, 119-20 (2006). In either case, "the reviewing court must indulge in a strong presumption that counsel's conduct fell into a wide range of reasonable representation, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *People v. Cloutier*, 191 Ill. 2d 392, 402 (2000); see also *People v. Gacy*, 125 Ill. 2d 117, 126 (1988) ("The burden of proving incompetence, and of overcoming the presumption that an attorney's decision is the product of 'sound trial strategy,' rests upon the defendant, not the State"). "A defendant can overcome the strong presumption that defense counsel's choice of strategy was *sound* if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." (Emphasis in original.) *People v. King*, 316 Ill. App. 3d 901, 916 (2000).

Here, in light of defense counsel's testimony at the hearing on the defendants' posttrial motions, it is evident that counsel's failure to call any witnesses in support of the defendants' defense was a matter of trial strategy as opposed to witness reluctance or unavailability. We cannot conclude, however, that the strategy was sound or that the resulting prejudice was harmless.

While we recognize that abandoning or changing a defense during trial can be a plausible strategic decision (see *People v. Manning*, 334 Ill. App. 3d 882, 893 (2002); *Anderson v. Butler*, 858 F.2d 16, 19 (1st Cir. 1988)), as defense counsel made clear in his closing argument and at the hearing on the defendants' posttrial motions, the defense in the present case, *i.e.*, that the defendants were asleep while Maki and Holt murdered Gandy, remained the same throughout the trial and "was not abandoned." After promising and suggesting that the jury would hear evidence supporting the defense, however, counsel failed to present any evidence whatsoever, and his stated reasons for failing to do so are not reasonable explanations.

In his opening statement, defense counsel indicated that the jury would hear testimony that, after Gandy's murder, Maki had been seen with a collapsible baton and had bragged to several people that he had used it to kill Gandy. Counsel further suggested that the jury would hear testimony that, following the defendants' arrests, Maki and Holt had met at Wal-Mart to discuss what they were going to tell the police. Thereafter, counsel attempted to adduce this testimony when cross-examining Warren and Holt (and Detective Ryan), but, sustaining the State's objections that counsel's questions were beyond the scope of direct, the trial court, in the exercise of its discretion, precluded counsel from doing so. See *People v. Taylor*, 314 Ill. App. 3d 658, 664 (2000) ("[R]ulings involving the scope of a witness'[s] testimony on cross-examination are within the trial judge's discretion"); *Cuellar v. Hout*, 168 Ill. App. 3d 416, 425 (1988) ("Cross-examination in which a party attempts to put its theory of a case before a jury, but which is beyond the scope of the direct examination of the witness, is improper"). The court also instructed the jury to disregard all questions to which objections had been sustained. Counsel later explained that he did not call Warren as a witness because, although Warren would have testified that he had heard Maki say that he had beaten Gandy to death, "it was perfectly clear that [the defense] theory was that the two murderers were Jeff Holt, [the] State's star witness, and Rocky Maki, rather than either one of the [defendants]."[2] Counsel testified that he did not call Holt because he had successfully

---

[2]As previously noted, counsel also indicated that a pretrial ruling

impeached him and because "there was nothing to be gained for the defense" by calling him.

While it might have been "perfectly clear" that the defense theory was that Maki and Holt were solely responsible for Gandy's death, defense counsel failed to properly present any evidence to support that theory. After unsuccessfully attempting to elicit evidence in support of the theory through his cross-examination of the State's witnesses, counsel opted not to present a case in chief and thus made no further attempts to introduce any of the evidence that he had promised to produce. As a result, as the trial court observed at the hearing on the defendants' posttrial motions, nothing in the evidence before the jury "went to anything but the guilt of [the] defendants." Given that counsel justified the failure to call any witnesses by stating that he was able to make the argument that he wanted to make, one might conclude that counsel believed that by zealously arguing and suggesting that Maki and Holt were the real murderers, he need not have presented any evidence to support the claim. The trial court repeatedly instructed the jury, however, that opening statements and closing arguments are not evidence and that any statement made by an attorney that was not based on the evidence or on reasonable inferences that could be drawn from the evidence should be disregarded. In any event, despite the availability of witnesses whose testimony could have been used to support the defense theory that Maki and Holt were the real killers, the theory was left unexplored and undeveloped, and under the circumstances, counsel's chosen strategy was unreasonable. See *People v. Ortiz*, 224 Ill. App. 3d 1065, 1071-73 (1992).

It was further unreasonable for defense counsel not to call either of the defendants to support the claims that they were asleep in their bedroom while Maki and Holt killed Gandy and that Holt had awakened them and confessed that he and Maki had committed the murder. In his opening statement to the jury, counsel promised that the defendants would testify to what happened on the night of Gandy's murder, and he described in detail what their version of events would be. In his closing argument, after stating that the defense had

---

precluded him from asking Warren about Maki's statement, but that assertion is belied by the record. Maki's alleged statement to Warren was never the subject of a pretrial ruling. Moreover, after sustaining the State's objection to counsel's inquiry on the ground that it was beyond the scope of the State's direct examination, the court indicated that counsel was free to ask Warren about the statement in the defendants' case in chief. The court therefore evinced its willingness to at least consider allowing the statement to be admitted under the statement-against-penal-interest exception to the hearsay rule (see, *e.g.*, *People v. House*, 141 Ill. 2d 323, 390 (1990)).

not changed, counsel asserted that the defendants were in their bedroom when Maki and Holt attacked Gandy in the living room and at the cemetery and that "[t]hey only knew what Holt had told them in the middle of the night when he returned." Counsel later testified that by not calling the defendants to testify, he avoided subjecting them to cross-examination and further avoided the possibility that the State might elicit damaging rebuttal evidence in response to their testimony. It thus appears that counsel concluded that rather than support the defense theory with evidence that the jury might reject, it was better to not support the theory at all. In our view, this was not a reasonable strategic decision. Counsel further explained that he did not call the defendants as witnesses because the State's witnesses had provided "almost every element of [the defense] theory" and he was thus able to make the argument that they wanted to make without their testimony, an explanation which again suggests that he erroneously believed that he did not need to support his arguments with evidence. In any event, counsel's failure to call the defendants to testify left their defense unsupported, and under the circumstances, counsel's chosen strategy was unsound.

We cannot conclude that counsel's failure to call any witnesses in support of the defense that he both promised and adhered to throughout the defendants' trial was a rational strategic decision. It appears that counsel believed that by making the closing argument that he wanted to make and by asking the jury to not hold the failure to present any evidence against the defendants, the jury would ignore the court's instructions regarding opening statements, closing arguments, statements not based on evidence, and questions to which objections had been sustained. If this was, in fact, counsel's strategy, it ignored that "it is 'the almost invariable assumption of the law that jurors follow their instructions.' " *People v. Sandoval*, 135 Ill. 2d 159, 192 (1990), quoting *Richardson v. Marsh*, 481 U.S. 200, 206, 95 L. Ed. 2d 176, 185, 107 S. Ct. 1702, 1707 (1987). As it stood, even if the jurors were inclined to consider the theory advanced by the defense, they had no choice but to ignore it because they were presented with no evidence to support it. The supreme court has observed, " '[t]he spectrum of counsel's legitimate tactical choices does not include abandoning a client's only defense in the hope that a jury's sympathy will cause them to misapply or ignore the law they have sworn to follow.' " *People v. Chandler*, 129 Ill. 2d 233, 248 (1989), quoting *United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987). We likewise believe that the spectrum of sound strategy does not include failing to adduce available evidence that would support an otherwise unsupported defense in the hope that the jury will both forgive

counsel's promises to present that evidence and ignore the court's instructions. In the present case, counsel's conduct fell below an objective standard of reasonableness because no reasonably effective defense attorney, facing similar circumstances, would have pursued the same strategy.

We must next address whether the defendants were prejudiced by defense counsel's substandard performance, because "[t]he failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Deleon*, 227 Ill. 2d 322, 338 (2008). In the absence of overwhelming evidence establishing a defendant's guilt, the failure to present promised evidence that someone other than the defendant is guilty of the offense in question is highly prejudicial (see, *e.g.*, *Ortiz*, 224 Ill. App. 3d at 1072-73), as is the failure to present a defendant's testimony after promising to do so (see, *e.g.*, *People v. Briones*, 352 Ill. App. 3d 913, 921 (2004)). With respect to the latter, it has been said:

> "When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made."
> *Ouber v. Guarino*, 293 F.3d 19, 28 (1st Cir. 2002).

It has further been held, "[W]here a lawyer has promised the jury that a criminal defendant will testify in his own defense, and then unreasonably breaks this promise by not calling the defendant to the stand, such an error is both objectively unreasonable and prejudicial to the defendant." *Barrow v. Uchtman*, 398 F.3d 597, 606 (7th Cir. 2005).

Here, although the evidence presented for the jury's consideration was sufficient to prove the defendants' guilt beyond a reasonable doubt (see *People v. Tenney*, 205 Ill. 2d 411, 429 (2002)), the State's case hinged on the testimony of an admitted addict and uncharged accomplice whose testimony defense counsel effectively impeached. Moreover, not only did counsel promise in his opening statement that the jury would hear a theory *contra* to the State's, throughout the course of the trial, he repeatedly indicated, in the jury's presence, that he would present evidence supporting the theory in the defendants' case in chief. Given the import of the testimony that counsel promised to present but failed to deliver and given that he had repeatedly asked the jury to reserve judgment until it had heard all the evidence, the defendants were undoubtedly prejudiced by counsel's conduct. See *Ortiz*, 224 Ill. App. 3d at 1073; *Anderson*, 858 F.2d at 19. Although counsel vigorously cross-examined the State's witnesses and exposed

various weaknesses in the State's case, by leaving the defense theory wholly unsupported, counsel allowed the State to rightfully argue to the jury that its theory was uncontradicted and that there was "no evidence, whatsoever, that [the defendants were] in the bedroom." Given that the evidence of the defendants' guilt was not overwhelming, had counsel properly supported the defense theory with witness testimony, in our view, there is a "reasonable probability" that "the trial result would have been different." *Johnson*, 218 Ill. 2d at 143-44. That said, because the State's evidence was sufficient to prove the defendants' guilt beyond a reasonable doubt, "there is no double jeopardy impediment to a new trial." *Tenney*, 205 Ill. 2d at 442. We accordingly reverse the defendants' convictions and remand this cause for a new trial.

■ Because the issue is likely to arise again on remand, we will lastly address an evidentiary issue that the defendants argue on appeal. See *People v. Harlacher*, 262 Ill. App. 3d 1, 8 (1994). As previously noted, when questioned following their arrests, both defendants claimed that they had not murdered Gandy, and although they indicated that they were aware that something had happened to him, they refused to give statements regarding what they knew. During the interviews, investigators advanced several hypothetical scenarios regarding what might have led to Gandy's murder, but their efforts to elicit incriminating statements failed. At one point, Lisa did ask if Illinois had the death penalty, and when asked what should happen to whoever killed Gandy, she stated that they should receive "[a] lot of rehab."

At the trial, the State sought to have video recordings of the defendants' interviews admitted into evidence. As grounds for their admission, the State argued that the recordings were relevant because they demonstrated that "the defendants had multiple opportunities *** to explain what had happened at their residence." The State further argued that the defendants' body language during the interviews was also relevant. Defense counsel maintained that the recordings were irrelevant and did not contain any actual admissions. Referring to the investigators' use of hypothetical scenarios, defense counsel further argued that the recordings contained numerous unfounded allegations that could only prejudice the defendants. After reviewing the transcripts of the videos, the trial court sustained some of counsel's objections to specific portions of the recordings on relevancy grounds and ordered those portions redacted. The trial court held that the recordings' contents were otherwise relevant and admissible under the admissions-by-party-opponent exception to the hearsay rule. The recordings of the defendants' interrogations were

played for the jury during the trial, and the jury heard the hypothetical scenarios posited by the investigators. When the recordings were played, however, the trial court *sua sponte* instructed the jury as follows: "The questions posed by the interviewers are to be considered by you, not as evidence of what occurred, but as statements designed to elicit a response from the defendants as to what occurred." On appeal, the defendants contend that the trial court erred in allowing the State to use the video recordings because they contained irrelevant and prejudicial material.

As a general rule, evidence is admissible if it is relevant. *People v. Begay*, 377 Ill. App. 3d 417, 421 (2007). "Generally, evidence is relevant if it tends to make the existence of any fact in consequence more or less probable than it would be without the evidence." *People v. Beaman*, 229 Ill. 2d 56, 75-76 (2008). "Relevant admissions of a party, whether consisting of a statement or conduct, are admissible when offered by the opponent as an exception to the hearsay rule." *People v. Cruz*, 162 Ill. 2d 314, 374-75 (1994). Moreover, courts generally "grant wide latitude in construing statements as admissions." *Zaragoza v. Ebenroth*, 331 Ill. App. 3d 139, 142 (2002). "Even if evidence is relevant, it should be excluded if its prejudicial impact substantially outweighs its probative value." *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 100 (2008). "The determination as to whether evidence is relevant and admissible is within the sound discretion of the trial court, and its ruling will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Gonzalez*, 379 Ill. App. 3d 941, 948-49 (2008). A trial court abuses its discretion when its ruling is "arbitrary, fanciful[,] or unreasonable[ ] or when no reasonable person would take the same view." *People v. Jenkins*, 383 Ill. App. 3d 978, 988-89 (2008).

Here, the trial court did not abuse its discretion in admitting the recordings of the defendants' interviews. The court considered the recordings' contents, considered counsel's objections, ordered that certain portions of the recordings be redacted, and gave a limiting instruction specifically directed at the concern that the jury might consider the investigators' hypothetical scenarios as evidence. We thus agree with the State's observation that "the court exercised considerable discretion with respect to the videos' admission." We further agree with the State's suggestion that although the recordings' probative value was relatively minimal, "it was certainly not outweighed by any prejudicial material."

During the interviews, neither of the defendants confessed to have taken part in Gandy's murder, and although in its closing argument the State referred to Lisa's inquiry about the death penalty as "an

expression of guilt," through his cross-examination of one of the interrogators, defense counsel suggested that Lisa's "death penalty" and "rehab" statements were "perfectly appropriate" considering that Lisa was a cocaine addict charged with first-degree murder. In its closing argument, the State also noted that, although the defendants had the opportunity to tell their side of the story during the interviews, they did not, but defense counsel countered that the recorded interrogations proved the defendants' innocence because, despite "being interrogated for hours on end," the defendants refused to "confess to murdering somebody they didn't murder." In response to the State's argument that the defendants' body language suggested that they were guilty, counsel maintained that by purporting to interpret the body language of two individuals who had "been up for days high on cocaine" and then accused of murder, the State was making a desperate attempt to compensate for its lack of actual evidence.

However the jury ultimately chose to perceive the contents of the recordings, we cannot conclude that the evidence was irrelevant or that the trial court's decision to admit the evidence was arbitrary, fanciful, or unreasonable. We therefore reject the defendants' contention that the trial court abused its discretion by allowing the jury to view the video recordings of the defendants' interviews.

## CONCLUSION

For the foregoing reasons, we reverse the defendants' convictions and remand for a new trial.

Reversed; cause remanded.

GOLDENHERSH and DONOVAN, JJ., concur.