2015 IL App (1st) 130205
No. 1-13-0205
Opinion filed September 30, 2015

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | |
| v. | No. 11 CR 15157 |
| LARRY WINKFIELD, | The Honorable Stanley Sacks, |
| Defendant-Appellant. | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Simon concurred in the judgment and opinion.

**OPINION**

¶ 1    As prosecutors and criminal defense attorneys know, few assertions can wreck one's case more than an unfulfilled promise made to a jury in opening statements. Defendant Larry Winkfield contends on appeal that his trial counsel rendered ineffective assistance during opening statements by promising to present alibi witnesses to the jury and then failing to carry it out. We are unable to conclude on this record that defense counsel rendered ineffective assistance. We affirm defendant's conviction on direct appeal as we find that defendant's claim would be better resolved in postconviction proceedings.

¶ 2                                    BACKGROUND

¶ 3        Under the State's theory of the case, Winkfield initially encountered the victims, Joshua Holmes and his wife, Dellanice Holmes, when cars driven by Winkfield and Joshua Holmes collided. Winkfield and Joshua Holmes exchanged phone numbers and agreed to pay each other's damages. Winkfield later appeared at the Holmes' home, and each drove their own cars to a body shop. There, Winkfield confronted the victims with a gun, demanded they pay his damages, and drove away in their car. Winkfield was charged with aggravated vehicular hijacking, armed robbery, and aggravated unlawful restraint of both Joshua and Dellanice Holmes.

¶ 4        In Winkfield's answer to the State's motion for pretrial discovery, Winkfield argued he would rely on the State's inability to establish its burden of proof for the offenses. The answer listed potential witnesses including Lanisha McMann, Jasmine Hodges, and Donovan Hodges. In a supplemental answer, Winkfield amended his response to include the "affirmative defense of alibi" alleging he had been at the home of Lanisha McMann with his wife, Jasmine Hodges, and brother-in-law, Donovan Hodges, from around 7 p.m. and thereafter on the night of the offense.

¶ 5        A team of three attorneys represented Winkfield at trial. One of his defense attorneys stated in his opening statement:

    "My client calls his wife, Jasmine Hodges, and he says I'm coming to pick you up. He does. He picks her up and then they head to the home of Lanisha McMahon.

    ***

    Lanisha was going to style or she was going to do the hair of Jasmine while Larry and Donovan watched the Bears game.

The evidence will show that Lanisha lives at 5057 West Huron, which is approximately at Huron and LeClaire.

The evidence will show that Larry and Jasmine arrived at Lanisha's house [sometime] in the middle of the first-half of the Bears game. Football fans, that would be anywhere an hour, an hour and a half after the initial game time, so 7 to about 8:30. They arrived sometime we'll say around 8 o'clock, 8:15.

Lanisha did Jasmine's hair. The boys watched the football game, and they stuck around until 11 or 12 at night, and you will hear from those people talk about that."

¶ 6        Counsel also highlighted the lack of physical evidence linking Winkfield to the crime and contended that the State would be unable to prove Winkfield guilty beyond a reasonable doubt based on the victims' inconsistent testimony and their motive to lie about the offense.

¶ 7        Joshua Holmes testified at trial in a corrections uniform because he had been taken into custody for contempt of court after missing a court date in the case. He testified that on September 1, 2011, he and Winkfield got into a car accident near the intersection of Grand Avenue and Pulaski Road, sometime between 4 and 7 p.m. Following a "brief" discussion, they agreed to pay for one another's damages, exchanged names and phone numbers, and agreed to contact one another at a later time regarding the repairs. Winkfield did not provide his real name during this exchange, according to Holmes. After the accident, Holmes drove home.

¶ 8        Once home, he parked his car in front of the house. His wife, Dellanice Underwood Holmes, from whom he had since separated, went to look at the damage, which was extensive. About 30 minutes to an hour after the accident, between 7 and 8:30 p.m., Winkfield arrived at their home with a passenger in his car, despite never being provided the address. Joshua Holmes claimed that "some [one] came upstairs to get [him]" when Winkfield arrived, so he went outside

to speak with him. Dellanice Holmes testified, however, that no one went to get Joshua Holmes when Winkfield arrived, but that Joshua came outside of his own accord some 5 to 10 minutes later. After a "short" discussion, the Holmeses agreed to follow Winkfield to a body shop to "at least get a[n] estimate of our damages." Both parties drove their own cars.

¶ 9    The Holmeses parked across the street from the body shop and waited in the car with the engine running while Winkfield knocked on the door to the body shop. After several minutes, when no one answered, Winkfield walked towards their car brandishing a gun, got "face to face" with Joshua Holmes, pointing a gun at him from a distance of about three to four feet, then ordered him out of his car and demanded "money for [his] car." Joshua Holmes told Winkfield he didn't have any money and instead offered Winkfield his mobile phone. Winkfield then got into Holmes' car and drove away. Winkfield's passenger, whom Holmes described as a dark-skinned male with dreadlocks, drove away in Winkfield's car. Joshua Holmes also confirmed on direct and cross-examination that he had a prior felony conviction in February 2009, for possession of a controlled substance.

¶ 10    Dellanice Holmes testified that when Winkfield approached their car, he pulled the gun from his side and pointed it directly at her chest from a distance of about four to five feet before walking to the other side of the car and pointing the gun at her husband. As Winkfield walked around the vehicle towards Joshua Holmes, he got out of the car. Dellanice Holmes then got out of the car too, and ran to hide behind a van parked directly in front of the body shop and next to Winkfield's car. Winkfield asked Joshua Holmes what he had in his pocket (to which he responded his mobile phone), demanded the phone, and then asked Dellanice Holmes if she had a mobile phone as well. When she informed Winkfield she did not, he got into the Holmeses' car

and drove away. Winkfield's passenger, whom Dellanice Holmes described as a young black male with braids in his hair, drove away in Winkfield's car.

¶ 11    Immediately after the incident, the victims ran across the street and borrowed a stranger's mobile phone to contact the police. The call came in at exactly 8:32 p.m. Later that night, the victims found Winkfield's unoccupied car parked about three to four blocks away from the body shop, and called police to inform them of its location.

¶ 12    The next day, on September 2, between 12 and 1 p.m., Dellanice Holmes located her husband's stolen car in the lot of a trucking company not far from the body shop. The car's license plates had been removed, the inside of the car had been burned, and it was sitting on two wheels. The victims and Joshua Holmes' brother returned to this location later that evening around 9:30 p.m. with the police. While waiting for the police to arrive, Joshua Holmes and his brother located Winkfield in a nearby park. The victims then accompanied the police to a location near the park where Winkfield was arrested. As part of the ongoing investigation, the police obtained buccal swabs from both Winkfield and the victims.

¶ 13    Chicago police officers Ark Pachnik, Kevin Quinn, and forensic scientist Ruben Ramos also testified on behalf of the prosecution. Officer Pachnik described the damage to the victims' car, and stated that he saw the victims simultaneously identify Winkfield as the offender when they arrived at the location of Winkfield's arrest. Officer Quinn testified that he first spoke with the victims around 6:30 p.m. on September 2, and again around 9 p.m. that evening and Joshua Holmes gave a description of Winkfield that enabled the officer to locate and detain a person who the victims later identified as Winkfield. Ramos testified that due an inadequate sample he was unable to determine if Winkfield was ever present in the stolen car because he could not match Winkfield's DNA sample to a sample of DNA taken from the car.

¶ 14     Winkfield presented only the testimony of Officer Anthony Keny, the initial responder. Officer Keny testified that Joshua Holmes did not provide the name Winkfield at the time of the initial report; that Joshua Holmes and Winkfield made an "agreement to meet [at the body shop]" after receiving "a cell phone [c]all" from Winkfield; that he described the passenger in Winkfield's vehicle as an "unknown male Black between the ages of 28 and 25 years old," but did not mention the person had dreadlocks or braids; and that "Offender number one [Winkfield] exited from the passenger side" of his car when they arrived at the body shop. On cross-examination, Officer Keny confirmed the victims were "visibly shaken" and had a hard time expressing themselves and confirmed the description on the police report was substantially accurate.

¶ 15     During closing argument, defense counsel argued the State had not proved Winkfield guilty beyond a reasonable doubt due to the lack of physical evidence, inconsistencies in the victims' testimony, and the Holmeses' motive to lie about the accident to avoid paying for Winkfield's damages. Defense counsel also referenced cocounsel's remarks during opening statements regarding alibi witnesses.

> "And yesterday, [cocounsel] told you that you were going to hear evidence about an alibi; that [Winkfield] was somewhere else. Well, you didn't hear that, because we don't have the burden. We don't have to prove anything. The State is the one who has to prove to you that he did this. We don't have to put one single witness on the witness stand. And you all said that was fine."

¶ 16     The jury convicted Winkfield of aggravated vehicular hijacking, armed robbery, and aggravated unlawful restraint of Joshua Holmes and returned a verdict of not guilty of

aggravated unlawful restraint of Dellanice Holmes. The trial court sentenced Winkfield to concurrent terms of 22, 21, and 3 years in prison.

¶ 17                                                ANALYSIS

¶ 18        Winkfield argues that his defense attorney impeded his right to effective assistance of counsel by promising in the opening statement, but ultimately failing, to present alibi witnesses to the jury.

¶ 19        To prove a deficient performance, the defendant must establish that counsel's conduct fell below an objective standard of reasonableness and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999). Prejudice means a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 20        A defense counsel's failure to present testimony as promised, while a serious deficiency, does not constitute ineffectiveness *per se*. See *People v. Briones*, 352 Ill. App. 3d 913, 918 (2004). A defendant must still show that his or her counsel's error resulted in prejudice. *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002). The test is not whether defense counsel fulfilled every promise made during opening statements, but whether any error by counsel was so grave that had the error not occurred, the result of the case would likely have been different. *Id*. at 884.

¶ 21        Generally, due to the nature of the error, counsel's failure to present witnesses as promised during opening statements constitutes deficient performance unless the failure can be attributed to trial strategy–either because an unforeseen or unexpected event hindered its presentation or because the testimony would be contradictory to defendant's interests by, for example, contradicting defendant's theory of the case. *People v. Patterson*, 192 Ill. 2d 93, 121 (2000). Similarly, once defense counsel has made a definite promise to present evidence,

especially a promise of exculpatory evidence, absent extenuating circumstances, defense counsel must diligently attempt to fulfill the promise due to the gravity of such a pledge. See *Briones*, 352 Ill. App. 3d at 918 ("Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility. In no sense does it serve the defendant's interests." (quoting *United States ex rel. Hampton v. Leibach*, 347 F. 3d 219, 257 (7th Cir. 2003)).

¶ 22    Winkfield's counsel made an explicit promise to present evidence of Winkfield's alibi to the jury. At the beginning of the trial, counsel stated: "The evidence will show that Larry and Jasmine arrived at Lanisha's house sometime in the middle of the first-half of the Bears game. *** They arrived sometime we'll say around 8:00 o'clock, 8:15 *** they stuck around until 11:00 or 12:00 at night, and you will hear from those people talk about that." This having been said, counsel was obligated to fulfill the promise, or at least explain why he failed to do so.

¶ 23    Counsel responded to the failure of the defense to call these witnesses. The jury was told that it did not hear the alibi evidence "because [Winkfield does not] have the burden *** to prove anything." While counsel's statement may be sufficient to excuse his failure (see *e.g. Patterson*, 192 Ill. 2d at 121), this statement serves to notify us that counsel was aware of the promise made and attempted to minimize the effect of his failure. See *People v. Ligon*, 365 Ill. App. 3d 109, 120 (2006) ("case law suggests that the decision not to provide promised testimony may be warranted by unexpected events").

¶ 24    We also acknowledge that case law dictates that issues of ineffective assistance of counsel must be determined from the "totality of counsel's conduct, not from isolated incidents"

(*People v. Spann*, 332 Ill. App. 3d 425, 430 (2002)), and a review of the record indicates that apart from this error, defendant's team of lawyers otherwise rendered competent representation.

¶ 25    *People v. Bryant*, 391 Ill. App. 3d 228 (2009), is instructive. In *Bryant*, a jury found husband and wife codefendants guilty of murdering a drug dealer. In defense counsel's opening statement, he "set forth in detail what the defendants' testimony would purportedly establish," including the alibi that his clients slept while the offense occurred and that two other individuals might have committed the murder. *Id*. at 230. At trial, counsel failed to present any witnesses, including the defendants' own testimony. *Id*. at 230-36. The *Bryant* court concluded that counsel was deficient for failing to present this testimony where the error effectively failed to subject the State's case to meaningful adversarial testing by leaving the defense theory "wholly unsupported." *Id.* at 243.

¶ 26    Here, unlike *Bryant* where defense counsel failed to present a single witness as promised, defense counsel presented at least one witness. Although this witness did nothing to support defendant's alibi, the testimony supported defense's theory that the victims lied about Winkfield being the person who committed the offense by undermining the credibility of Joshua Holmes as the State's key witness. Therefore, defense counsel called a witness that later supported his closing argument that the State had not met its burden beyond a reasonable doubt because the victims' testimony was incredible.

¶ 27    Furthermore, *Bryant* involved a case where the issue involved defense counsel's failure to present the testimony of the defendants, after explicitly detailing what their testimony would be during opening statement. The defendants, being in court, obviously were available to testify. Here, counsel represented that alibi witnesses would testify. We simply do not know whether their absence was due to any deficient representation or merely a failure to cooperate or appear,

or some other unforeseen of unexpected event. Hence, under the totality of the circumstances, we are unable to conclude counsel performed deficiently on these facts alone. Rather, disposition of Winkfield's claim requires inquiry into matters outside of the record on direct appeal.

¶ 28    When the four corners of the record is insufficient to address the issue of ineffective assistance of counsel, this court may decline to adjudicate the claim in a direct appeal in favor of addressing it in a proceeding for postconviction relief where matters outside the common law record can be considered. See *People v. Burns*, 304 Ill. App. 3d 1, 11-12 (1999).

¶ 29    Nonetheless, the State attributes counsel's error to sound trial strategy. First, the State argues that counsel made a strategic decision not to present the promised alibi evidence based on the trial court's ruling mid-trial to admit Winkfield's prior felony conviction should he testify. But Winkfield does not argue that his counsel failed to present his testimony, rather counsel erred by promising and then failing to present even one of the three alibi witnesses identified in counsel's opening—McMann, Donovan, and Jasmine Hodges. Thus, the trial court's ruling regarding Winkfield's prior felony conviction is irrelevant.

¶ 30    Similarly irrelevant is the State's focus on the credibility of the potential alibi witnesses. The State argues that we can assume counsel's failure related to trial strategy where the jury would have found the proffered alibi witnesses incredible due to their close relationship with Winkfield. This argument, however, overlooks the fact that the error lies purely in counsel's unfulfilled promise. Although trial strategy may apply to a decision not to present certain witnesses, it offers no explanation as to why, after making the promise, the jury heard from none of the alibi witnesses. See, *e.g.*, *People v. King*, 316 Ill. App. 3d 901, 913-16 (2000) (appellate courts will not assume defense counsel's failure to present exculpatory evidence was reasonable "trial strategy," unless supported by the record); *People v. Garza*, 180 Ill. App. 3d 263, 269

(1989) (remand for new trial on ineffective assistance of counsel where counsel failed to present witnesses who would corroborate defendant's defense, noting that it could "conceive of no sound tactical reason" for not calling the witnesses).

¶ 31    We pause to briefly address the State's repeated use of the adverb "clearly" in its brief. "Clearly," and its next-of-kin "obviously," as legal writing guru Brian A. Garner has noted, "protest too much. They signal weakness." Bryan A. Garner*, The Winning Brief: 100 Tips for Persuasive Briefing in Trial and Appellate Courts* 363 (Oxford Univ. Press ed., 2d ed. 2004). Garner wisely advises that brief writers "let the court decide for itself what is clear or obvious. Your arguments and supporting evidence should be able to stand on their own*." Id.* at 364. We have decided, and what the State describes as "clearly" is not so clear at all.

¶ 32    To prevail on a claim of ineffective assistance, Winkfield must also show that counsel's error prejudiced him in a way that undermines this court's confidence in the trial's outcome. See *Manning*, 334 Ill. App. 3d at 892; *Strickland*, 466 U.S. at 694. Courts have long recognized the extreme prejudicial effect of promising to present evidence to a jury but failing to do so, especially when the evidence may be deemed "significant exonerating evidence." See *Briones*, 352 Ill. App. 3d at 918 ("little is more damaging than to fail to produce important evidence that had been promised in an opening" (internal quotation marks omitted) (quoting *Leibach*, 347 F. 3d at 257)). Here, this peril appears especially potent because the outcome turned purely on the credibility of the victims' testimony.

¶ 33    Defense counsel made credibility a key issue by attacking the credibility of the State's eyewitnesses—the victims. This strategy was reasonable as the victims' testimony presented the only available evidence tending to prove Winkfield committed the offense; there was no physical evidence or independent observation by police officers connecting Winkfield to the crime.

Defense counsel effectively employed this strategy and severely weakened the strength of the State's case by demonstrating the inconsistencies in the testimony by each of the victims. We highlight these inconsistencies and contradictions due to the closely balanced nature of the evidence, which magnifies the potential for prejudice created by counsel's error.

¶ 34    For example, although the victims sat in the same car and presumably had similar vantage points for the duration of the offense, their testimony conflicted on several material details. Joshua Holmes testified that Winkfield walked directly to his side of the car and pointed the gun at him; Dellanice Holmes stated that Winkfield walked to her side of the car and first pointed the gun directly at her before walking around the car. Furthermore, while Joshua Holmes claimed he had no money so he offered Winkfield his mobile phone, Dellanice Holmes claimed Winkfield demanded Joshua Holmes give him his phone. The testimony also established minor discrepancies in the victims' statements about their respective version of events and the physical description of the passenger in Winkfield's car, among other discrepancies.

¶ 35    Defense counsel also undermined the credibility of the State's key witness, Joshua Holmes, by offering Officer Keny's testimony that he failed to provide key pieces of information (like Winkfield's name) and gave a different account of the incident to officers immediately after the offense than he did to investigators just a day or two later; in particular concerning the events that led up to the parties' encounter at the body shop, and similarly, whether Winkfield drove his own car or was the passenger.

¶ 36    We would be remiss in highlighting the weaknesses in the State's case, however, without also identifying its strengths. For example, the victims testified on the weapon allegedly used by Winkfield to commit the offense—they both described the gun as a black revolver. Furthermore, the victims simultaneously identified Winkfield as the offender to assist police officers in

effectuating an arrest. In addition, based on the timeline of events and the relatively small geographical area from where the offense took place to McMann's residence where defendant supposedly watched a football game, Winkfield could have committed the offense and made it to McMann's residence by the time indicated in defense counsel's opening statement.

¶ 37     Here, as in *Bryant*, defense counsel promised the jury the testimony of witnesses whose story would be completely at odds with the State's case, namely, that Winkfield watched a football game at a friend's home during the time of the offense. As we have previously described, although Winkfield's counsel presented testimony that highlighted inconsistencies and weaknesses in the State's case, this did nothing to support the defense's repeated promise that the jury would hear evidence directly contradicting the State's case. As the court concluded in *Bryant,* "[g]iven that the evidence of defendant's guilt was not overwhelming, had counsel properly supported the defense theory with witness testimony, in our view, there is a 'reasonable probability' that 'the trial result would have been different.'" *Bryant,* 391 Ill. App. 3d at 243 (citing, *People v. Johnson*, 218 Ill. 2d at 143-44 (2005)). Therefore, in light of *Bryant*, given the overall nature and quality of the evidence, counsel's unfulfilled promise did prejudice Winkfield.

¶ 38     But, because of the absence of a record to establish counsel's performance was deficient, in light of the over-all nature and quality of the evidence considered in light of counsel's otherwise effective representation absent his errant promise during opening statements, we are not satisfied on this record that counsel rendered ineffective assistance. To adjudicate Winkfield's claim, we must inquire beyond the scope of this record. Therefore, we conclude Winkfield has not demonstrated ineffective assistance of counsel within the definition laid down by *Strickland* on this record. We affirm the judgment of the circuit court of Cook County and direct defendant to raise this claim in a postconviction petition for relief.

¶ 39        Affirmed.