NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 170607-U

NO. 4-17-0607

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 27, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| NATHAN D. COBBS, | ) | No. 16CF1185 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding defendant's various complaints about an
audio recording of a jailhouse telephone call and a handwritten jailhouse note were
either forfeited or meritless.

¶ 2    Defendant, Nathan D. Cobbs, appeals from his conviction for aggravated robbery.

On appeal, defendant raises various complaints about two items admitted at his jury trial,

specifically an audio recording of a jailhouse telephone call and a handwritten jailhouse note. We

affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Information

¶ 5    In December 2016, the State charged defendant by information with aggravated

robbery (720 ILCS 5/18-1(b)(1) (West 2014)). The information, as later amended, alleged, on July

5, 2016, defendant, in Champaign County, "knowingly took property from the person or presence of Jeremy R[.] Davis, namely a backpack and its contents[,] a debit card[,] and a cell phone[,] by threatening the imminent use of force while indicating by his actions that he [was] armed with a firearm or other dangerous weapon."

¶ 6                                    B. Motions *in Limine*

¶ 7            On May 18, 2017, the State filed a motion *in limine* seeking to introduce at trial evidence of defendant's alleged unlawful use of Davis's debit card following the commission of the aggravated robbery as well as defendant's later attempts to suborn perjury. Specifically, the State sought to introduce, *inter alia*, (1) a surveillance video allegedly showing defendant using Davis's debit card at a Casey's General Store in Tuscola on July 5, 2016; (2) a handwritten jailhouse note which defendant allegedly passed to another inmate on August 30, 2016, while he was incarcerated in Douglas County on a charge of unlawful possession of a credit card for conduct relating to this case; and (3) an audio recording of an April 17, 2017, telephone call defendant allegedly made while incarcerated in Champaign County to his girlfriend, Melissa White. The State asserted the evidence showing defendant's unlawful use of Davis's debit card was relevant and admissible to show both a common scheme with the robbery and a motive to commit the robbery. The State asserted the evidence showing defendant's attempts to suborn perjury was relevant and admissible to show defendant's consciousness of guilt. The State attached to its motion a transcript of the audio recording of the jailhouse telephone call and a copy of the handwritten jailhouse note.

¶ 8            On May 19, 2017, the State filed a motion *in limine* seeking to allow at trial Champaign police detective Robert Sumption to identify defendant in the surveillance video from

Casey's General Store pursuant to *People v. Thompson*, 2016 IL 118667, ¶ 59, 49 N.E.3d 393. The State provided a detailed review of *Thompson* and the necessary steps that must be taken prior to allowing a law enforcement witness to identify a defendant in a video. Specifically, the State noted defendant should be given the opportunity to examine the witness outside the presence of the jury to explore the witness's familiarity with the defendant and any bias or prejudice and to allow the court to make an informed decision as to whether the probative value of the testimony is substantially outweighed by the danger of unfair prejudice. The State further noted the court should, in the event it allowed such testimony, instruct the jury, both before the testimony and in the final charge to the jury, it need not give any weight to such testimony and should not draw any adverse inference from the fact the witness is a law enforcement officer. After addressing *Thompson*, the State provided a detailed summary of Detective Sumption's prior interactions with defendant.

¶ 9　　　　　On May 22, 2017, defendant filed a motion *in limine* seeking to bar at trial the introduction of certain statements and discussions contained in the audio recording of the jailhouse telephone call. Defendant listed multiple statements and discussions from the recording, such as "[t]he inmate stating that he 'copped out in Tuscola,' " and "[t]he inmate's and called person's discussion of meeting with his lawyer's investigator." Defendant argued the listed statements and discussions were "not relevant" and "unfairly prejudicial." Defendant requested the trial court to bar the State from "introducing any evidence of the statements outlined above."

¶ 10　　　　　　　　　　C. Hearing on Motions *in Limine*

¶ 11　　　　　On May 22, 2017, the trial court held a lengthy hearing on the parties' motions *in limine*. The court and the parties discussed, *inter alia*, (1) the audio recording of the jailhouse

telephone call, (2) the handwritten jailhouse note, and (3) Detective Sumption's identification of defendant in the surveillance video from Casey's General Store.

¶ 12                    1. *The Audio Recording of the Jailhouse Telephone Call*

¶ 13          As to the audio recording of the jailhouse telephone call, the trial court initially questioned defense counsel whether he was seeking to bar the entire call or just the specific statements and discussions outlined in defendant's motion. Defense counsel responded,

> "Judge, there's, there's multiple parts of the transcript that I'm seeking to bar. Well, Judge, I would ask to bar the entire, the entire transcript. I've highlighted some of the issues that I think are more pertinent than others but—which I've outlined in my motion as to why I think they should be barred."

¶ 14          The State argued the audio recording of the jailhouse telephone call was relevant to show (1) defendant was changing his account of what had occurred on the morning of the aggravated robbery and (2) a consciousness of guilt as defendant was attempting to suborn perjury from White during the call. The State, acknowledging defendant's motion largely related to whether several statements and discussions during the call were unfairly prejudicial, began going through the transcript of the call and addressing the statements and discussions, conceding at times certain redactions were necessary.

¶ 15          After the State had addressed some but not all of the statements and discussions in the transcript, the trial court directed defense counsel to elaborate on his specific complaints. Defense counsel initially stated:

> "Judge, the specific issues I'm objecting to—well, assuming that

the State is able to lay foundation, I think there's a hearsay issue with the other person on the other end of the call. I don't know if the State is going to be able to prove up who this person is. That witness, if they're able to prove up who they think it is, is not unavailable and they—as far as I know, they have not made any instances or attempts to bring her in to testify, so I think that is a larger issue with the jail call as far as foundation."

Defense counsel then proceeded by addressing specific statements and discussions and providing bases for why they should be redacted. For example, defense counsel argued certain statements were hearsay, not relevant, unfairly prejudicial, or a combination thereof. Relevant to the arguments raised on appeal, defense counsel objected to a statement indicating White would meet with defendant's lawyer on the ground the jury may "believe there's something improper occurring." Counsel also objected generally to a page of the transcript containing a statement where White references "Nate" on the ground it was irrelevant. On another page of the transcript containing a statement where White references "Nate," counsel made several objections but did not object to that specific reference.

¶ 16 In response, the State began by addressing defendant's "global objections" suggesting it could not lay a proper foundation and the phone call was hearsay. The State asserted it could lay a proper foundation under the silent witness theory and specifically noted it intended to call Detective Sumption who would testify he had previously spoken with both defendant and White and could identify their voices on the recording. As to defendant's hearsay objection, the State asserted defendant's own statements were not hearsay and it was seeking to introduce

White's statements not for the truth of the matter asserted but rather to provide "context" for defendant's statements. After addressing defendant's global objections, the State addressed defendant's specific objections, again conceding certain redactions were necessary. With respect to the discussion concerning defendant arranging a meeting between White and his lawyer, the State argued the discussion was relevant to show defendant intended White to give a specific version of events and, in order for that account to make sense, they had to talk about meeting with his attorney.

¶ 17 Defense counsel argued his main concern with the discussion concerning meeting with a lawyer was the implication that he may be a witness. Counsel also argued the discussions did not add anything as far as the probative value. In closing, counsel asserted the following:

> "Judge, just because I'm asking the [c]ourt to redact a
> substantial portion of this call *** it *** doesn't mean it's any less
> consumable by the jury. I think what the State is trying to get out of
> this call, if the [c]ourt allows, can be done based on the objections
> that I'm asking it to redact on."

¶ 18 The trial court initially ruled on defendant's objections to the specific statements and discussions outlined in his motion *in limine*. Based on its rulings, the court later recessed to go through the transcript and make certain redactions. After doing so, the court resumed the hearing and addressed the specific redactions it had made and allowed the parties to raise additional objections or arguments. Relevant to this appeal, the court, when addressing the specific redactions or lack thereof, commented on one of White's statements referencing "Nate." The court stated it believed the State was "entitled to get that in as it shows that the call is not being made by

somebody named Tramale *** Hooser." Defense counsel did not address the court's ruling. Counsel did, however, generally object to a page of the transcript which included a statement indicating the woman would testify for defendant on the ground the statements on that page were "irrelevant" and "more prejudicial than probative."

¶ 19                            2. *Handwritten Jailhouse Note*

¶ 20        As to the handwritten jailhouse note, the State argued the note was relevant to show consciousness of guilt as defendant was attempting to have another inmate generate an alibi for him. Defendant disagreed, arguing, generally, the note was "more prejudicial than probative." The court ruled it would allow the State to introduce the note.

¶ 21                    3. *Identification of Defendant in the Surveillance Video*

¶ 22        As to the State's request to allow Detective Sumption to identify defendant on the surveillance video from Casey's General Store, the trial court and the parties addressed in detail the implications and requirements of *Thompson*. The State played the surveillance video for the court and called Detective Sumption to testify about his prior interactions with defendant. Defense counsel cross-examined Detective Sumption. Following argument, the court ruled it would allow Detective Sumption to identify defendant and instruct the jury in accordance with *Thompson*.

¶ 23                                D. Jury Trial

¶ 24        On May 23 and 24, 2017, the trial court held a jury trial.

¶ 25        Davis testified, on the evening of July 4, 2016, he went to the apartment of his cousin, Mariah Laws, in Tuscola to "hang out." When he got to the apartment, approximately 10 to 15 people, including defendant, who Davis identified in court, and White, were standing around outside. White was Laws's friend and defendant's girlfriend. Davis claimed the gathering was a

get-together, not a party, and he was not drinking or gambling that night. Davis admitted he was on probation for driving under the influence at the time and his probation conditions included no alcohol or drug usage. He further could not drive. Davis did not recall previously telling Detective Sumption he was "partying" with Laws, White, and defendant on July 4. However, Detective Sumption testified Davis stated he "partied" with Laws, White, and defendant at Laws's Fourth of July party.

¶ 26   Laws, who had a 2015 felony conviction for methamphetamine manufacturing, testified, on July 4, 2016, she did not have a party but rather had others, including Davis, White, and defendant, over to her apartment. Laws testified everyone except Davis was drinking alcohol. Detective Sumption testified Laws told him during a February 2017 interview those in attendance at her party consumed alcohol. Laws testified she told Detective Sumption that "we were drinking," but she did not mean to account for everyone at her apartment.

¶ 27   Laws testified Davis, White, and defendant were still awake when she went to bed that night. She testified she did not tell Detective Sumption that Davis, White, and defendant stayed up partying. However, Detective Sumption testified Laws told him Davis, White, and defendant, "stayed up partying" when she went to bed. Davis denied staying up with White and defendant after Laws went to bed. Davis testified around 11 p.m. or midnight he fell asleep and then later woke up and needed a ride to his house in Tolono. Because Laws was still asleep, Davis asked defendant for a ride home.

¶ 28   Davis, defendant, and White left Laws's apartment around 1 or 1:30 a.m. in Laws's vehicle. Defendant drove. Davis fell asleep again in the car and then later awoke to discover they were in Champaign. Defendant drove to an ATM and Davis, at defendant's request, withdrew $10

from the ATM to give defendant for gas money. The State introduced surveillance video from the ATM. The video showed, at around 2:42 a.m., a two-door vehicle arrives at the ATM. A person exits the driver's side of the vehicle. The view is partially obstructed and only the person's leg, blue shorts, and black shoes can be seen. Davis then exits the vehicle, with a backpack on his back, from the driver's side, uses the ATM, and then returns to the vehicle. Davis testified he was sitting in the backseat of the vehicle, which required defendant to get out in order let him out to use the ATM. Davis also identified the leg initially seen in the video as belonging to defendant.

¶ 29　　　　According to Davis, defendant then drove to a different parking lot, got out of the car, pulled a black and chrome gun out of his waistband, and pointed the gun at Davis, who was still in the backseat of the car. Davis was approximately three to four feet from defendant. White was in the front passenger seat facing forward. Defendant "pulled the receiver back as he was chambering, as, as you would to chamber a bullet," and told Davis to give him all his belongings. Davis, believing the gun was real, emptied his pockets and gave defendant his wallet, work ID, state ID, debit card, cell phone, and bookbag. Defendant then told Davis to run, so Davis ran to a gas station about a mile and a half away, where he called his mom to pick him up. Davis passed a fire department on the way to the gas station. He testified he did not stop to seek help at the fire department because he did not believe it was open. Davis called 911 after he got home. Davis testified he did not call 911 immediately after he arrived at the gas station because he did not feel safe.

¶ 30　　　　Davis testified he never gave defendant permission to use his debit card, nor did he given anyone else permission to use his debit card at either the Baymont Inn or the Casey's General Store in Tuscola. The State introduced bank records reflecting attempted charges to Davis's debit

card at the Baymont Inn and the Casey's General Store on July 5, 2016. Davis testified he did not authorize any of the charges.

¶ 31        Craig Hastings, a police officer with the City of Tuscola, testified, on July 5, 2016, he went to the Baymont Inn because he was "given information that an armed robbery suspect was staying" there. He also received a description of the suspect and the vehicle the suspect was driving. When he approached the Baymont Inn, Officer Hastings saw defendant, who matched the description, standing next to an open driver's side door of a vehicle, which also matched the description. A backpack was near defendant. Officer Hastings approached defendant with his gun drawn and asked defendant to put his hands on top of the vehicle. Defendant complied.

¶ 32        Defendant asked what was going on, and Officer Hastings told him he believed defendant was a suspect in an armed robbery occurring in Champaign and the police had received a call that a stolen credit card had been used at the Baymont Inn. Defendant said, "that he had received that credit card from a man as payment in a gambling debt earlier in the evening." Officer Hastings handcuffed and searched defendant. He found Davis's debit card in defendant's pocket.

¶ 33        Officer Hastings asked defendant if the backpack on the ground nearby belonged to defendant. Defendant indicated it did. The backpack was placed inside the vehicle and then both were transported to a police impound lot. Officer Hastings obtained a search warrant for the vehicle and the backpack. Inside the backpack, Officer Hastings discovered an Airsoft gun, a utility bill in defendant's name, Davis's cell phone, Davis's wallet, Davis's ID cards, and some miscellaneous jewelry. Officer Hastings testified, although the Airsoft gun was not an actual gun, it looked like a real gun.

¶ 34        Detective Sumption testified, on July 5, 2016, he reported to the Baymont Inn.

When he arrived, three Tuscola police officers and a Douglas County Sheriff's deputy were present and had defendant, who was standing close to a vehicle, in custody. Detective Sumption testified defendant was wearing blue shorts. Detective Sumption told defendant he was under arrest for robbery, at which time defendant stated he had received the credit card as payment for a gambling debt. Detective Sumption then spoke with White, who was also present, for about five to ten minutes.

¶ 35 Later that day, Detective Sumption interviewed defendant at the Douglas County Sheriff's Office. Prior to the interview, defendant was read his *Miranda* rights. Defendant elected to speak with Detective Sumption.

¶ 36 Detective Sumption testified defendant provided the following account during the interview. On July 4, 2016, defendant met Davis at Laws's apartment. Laws was friends with defendant's girlfriend, White. Defendant and Davis played cards. Defendant said Davis "racked up a gambling debt of approximately $450." Davis gave defendant his debit card to pay off the debt. Defendant left Laws's apartment around 6 a.m. on July 5 and went to the Baymont Inn, where he used the debit card to pay for a four-night stay. Defendant stated he had permission to use the card. Defendant did not state he went anywhere else, and he denied driving Davis to Champaign. Defendant said the backpack the police found near the car did not belong to him, and he did not know how his utility bill or Davis's ID cards got into the backpack. Defendant told Detective Sumption that White would confirm he was at Laws's apartment the entire night.

¶ 37 Detective Sumption learned of unauthorized transactions on Davis's debit card at a Casey's General Store, which was about a mile and a half away from the Baymont Inn in Tuscola. He obtained a surveillance video corresponding with the time the card was used at Casey's. He

also later made photographic stills from the video. Detective Sumption testified he recognized defendant as the man using the debit card in the video based on his prior interactions with him. The trial court, both contemporaneous with the testimony and at the conclusion of the evidence, instructed the jury it need not give any weight to Detective Sumption's identification and it must not draw any adverse inference from the fact Detective Sumption was a law enforcement officer. The video and the photos were shown to the jury.

¶ 38       Joseph Kauffman, a correctional officer at the Douglas County Sheriff's Office, testified defendant was in custody on August 30, 2016. When Officer Kauffman took defendant out for "rec time" that day, he saw defendant drop something that appeared to be a folded piece of paper and try to kick it into the "dayroom" of the next cell block. The two inmates in that cell block were locked in their individual cells, and no one was in the dayroom. Officer Kauffman told another correctional officer, Kyle Stewart, what he saw.

¶ 39       Officer Stewart testified he went to the cellblock where Officer Kauffman saw defendant kick the note into. He testified both inmates in that cell block were locked in their individual cells and the dayroom was not accessible. Officer Stewart found a folded white piece of paper underneath a table in the dayroom. He believed the location where the paper was found was consistent with a location had someone kicked it into that cell block. He did not find any other items in the room consistent with the description given to him by Officer Kauffman. Officer Stewart secured the paper and then showed it to Officer Kauffman, who believed it was the same item he saw defendant kick into the cell block. The paper, or note, reads as follows:

"So look[,] check this out. I was wondering if befor[e] you

left[,] if you would be willing to help a friend out? I was wondering

- 12 -

if you could write a statement for me (since you ain't got your warrant to run from [and] you can[']t get in trouble for doing this).

Ok so I'm in here for unlawful possession of a credit card. [I]n my statement[,] I told them on the night of July the 4th[,] me, you (I didn't give your name)[,] Mariah[,] [and] that Jermy [*sic*] dude played spades [and] I ran him up 450 bucks. By the end of the night I told him that he was going to have to pay me [and] he told me all he had was a credit card. I told him if he got me four nights at the Bamonte [*sic*][,] whatever the cost was[,] he could keep the rest[,] [and] me [and] Melissa went back next door to take care of Katelynn who was drunk. [ ]The end[.]

All I need you to do is confirm that I was at your place that night[,] a card game did go on [and] that I went home after[]ward to attend to Melissa[']s daughter. [T]hat[']s it[.] [T]hat[']s all[.]

I swear if you do this for me[,] I'll give you anything you want[,] [and] that[']s my word[.] [I]f you want me to hit your books when I get home[,] I got you with no questions asked. [T]hat's why I wanted you to move over here so we could talk more."

¶ 40 Detective Sumption testified he was reviewing outgoing inmate telephone calls at the Champaign County Jail a few weeks before trial and found an audio recording of an April 17, 2017, call placed on an account for an inmate by the name of "Tramale Hooser" that he believed involved defendant and White. Detective Sumption specifically testified he recognized the voices

of defendant and White based on his prior interactions with them. As to White, Detective Sumption testified he had spoken with her during the investigation. On cross-examination, Detective Sumption testified he had only spoken with White "briefly," and the only time he did so was on the morning of July 5, 2016.

¶ 41 An edited audio recording of the jailhouse telephone call was played for the jury. At the beginning of the call, an automated recording requested the name of the inmate. A man states his name is "Tramale Hooser." Once a woman answers the phone, the man tells the woman, "I just paid somebody for a phone call." The woman tells the man she was going to meet with the man's lawyer the next day. The man tells the woman, "basically this is not on my account so I could say a few things" and then asked what she planned on telling his lawyer. The woman stated she had been avoiding his lawyer because she did not know exactly what she "was supposed to be doing." The man responded, "only thing you have to tell them is basically it was a drug deal, like I gave him, we were uh he was, uh we took him to Champaign to get money to buy drugs" and "he lied about the whole situation." The man also suggested the woman "could say that he gave uh me his credit card for exchange of drugs" and "he lied about uh me robbin him *** because don't nothing point to robbery, it just showed that I had his credit card." The woman said someone came to talk to her and that person was asking about a "dice game." The man said, "Yeah that's what I said that was my initial uh statement I told them a card game."

¶ 42 The woman said the man's lawyer asked if she would be willing to testify, and then asked the man if she should say yes. The man told her to say:

"[Y]eah *** as long as you say basically everything started that

night at *** Mariah's ***. We agreed to go to Champaign to get

drugs and when we got to Champaign he was supposed to pick off ten bucks which he did cuz the record is showin' it. Um and say we were supposed to go and buy drugs afterwards and he dropped out at uh *** friends in Champaign which was close to the Thornton's gas station ***, and basically fuckin' he gave us his credit card and we left."

The man and the woman then discussed some of the evidence against the man, including an ATM video showing the man's leg and a video showing the man in Tuscola using the credit card.

¶ 43      At one point, the woman questions why the man had another woman contact her. The man denied having the other woman contact her. The woman asks, "Well then why the fuck would she message me then Nate? I mean I'm not mad if you was talking to her I'm just saying." The man swears he was not speaking with the other woman. The woman states, "I'm gonna fuckin' die Nate."

¶ 44      The conversation returned to the woman meeting with the man's attorney, and the man said, "the key is literally in your lap like it's in your hands as long as you come." The woman states that was why she was scared. The man indicated he understood and "that's what I told him I knew exactly how you was thinking and I know you were like ah well um I don't, I know you're trying to still keep out of it but at the same time that's why I'm trying to tell him as long as I tell you exactly how to go about it and you was to come." The woman told the man she was crying when she "left" him and apologized for going "the opposite way" and she "knew that [the man] needed [her]." The man promised the woman he would marry her if she came and helped him. The woman said she would help the man.

¶ 45       In closing argument, the State argued, in part, defendant's account to Detective Sumption did not "hold water" and, therefore, he knew "it needed to be bolstered." To do so, the State asserted, defendant sent the handwritten jailhouse note, which the State then read to the jury for the first time. After reading the note aloud, the State argued the note showed defendant was attempting to suborn perjury. The State further argued defendant's attempt to suborn perjury in the note was consistent with his later attempt to suborn perjury in the audio recording of the jailhouse telephone call. In that call, the State argued, defendant was attempting to tell his girlfriend, White, what she needed to say in court. The asserted defendant's attempts to suborn perjury was not conduct of an innocent person.

¶ 46       Prior to retiring to the jury room, the trial court instructed the jury, in part, as follows:

"Evidence has been received the defendant has been involved in conduct other than that charged in the information. This evidence has been received on the issue of the defendant's motive and common design and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct, and if so, what weight should be given to this evidence on the issue of the defendant's motive and common design."

¶ 47       The jury left the courtroom to begin deliberations at 12:44 p.m. The trial court allowed various admitted exhibits to be sent back with the jury. At 1:45 p.m., the court received a note from the jury indicating it wanted to again hear the audio recording of the jailhouse telephone

- 16 -

call. Defendant objected to the recording "being played again" on the basis it would place an "undue importance" on the recording. The State responded to defendant's objection. The court inquired as to the manner in which it should allow the jury to hear the recording if it overruled defendant's objection. The State suggested the jury should be brought back into the courtroom, where the audio would be played again. In response, defense counsel stated, "if the [c]ourt is going to allow it to be played, I think the most appropriate way to do it would be to have them brought back in and play it and not sent back to them to, to play and stop and go forward with it." The court overruled defendant's objection and then brought the jury back into the courtroom and played the recording. The jury left the courtroom to resume deliberations at 2:10 p.m.

¶ 48        At 2:15 p.m., the jury informed the trial court it had reached a verdict. The jury found defendant guilty of aggravated robbery.

¶ 49        E. Posttrial Proceedings

¶ 50        On July 6, 2017, defendant filed a motion for a new trial. Defendant argued, in part, the trial court erred when it (1) partially denied his motion *in limine* to bar evidence of specific statements and discussions from the audio recording of the jailhouse telephone call; (2) granted the State's motion *in limine* allowing it to introduce other-crimes evidence relating to the use of Davis' debit card at the Baymont Inn, his "passage of a note to an inmate while he was incarcerated at the Douglas County jail," and "the phone calls placed to [White] while [he] was incarcerated at the Champaign County Jail"; (3) ruled against defendant's oral motion "to bar portions" of the audio recording of the jailhouse telephone call; and (4) allowed the audio recording of the jailhouse telephone call to be replayed during jury deliberations as it improperly "heightened [the] importance" of the recording.

- 17 -

¶ 51     At a July 10, 2017, hearing, defendant stood on his motion for a new trial. The trial court denied defendant's motion and then proceeded to sentencing. The court sentenced defendant to 10 years' imprisonment. Defendant later filed a motion to reconsider his sentence, which the court denied.

¶ 52     This appeal followed.

¶ 53                              II. ANALYSIS

¶ 54     On appeal, defendant raises various complaints about the audio recording of the jailhouse telephone call and the handwritten jailhouse note.

¶ 55          A. The Audio Recording of the Jailhouse Telephone Call

¶ 56     Defendant argues the trial court erroneously (1) permitted Detective Sumption to identify White in the audio recording of the jailhouse telephone call without first employing the mandatory procedural safeguards set forth in *Thompson*, (2) admitted certain hearsay and overly prejudicial statements from the audio recording, and (3) permitted the jury to review the audio recording inside the courtroom during deliberations.

¶ 57                    1. Thompson *Procedural Safeguards*

¶ 58     Defendant contends the trial court erroneously permitted Detective Sumption to identify White in the audio recording of the jailhouse telephone call without first employing the mandatory procedural safeguards set forth in *Thompson*. Specifically, defendant asserts the trial court was required to conduct a hearing outside the presence of the jury to determine whether Detective Sumption's conversation with White provided a sufficient basis for an identification and, if so, whether the probative value of the identification was not exceeded by the risk of unfair prejudice. Defendant further asserts, even if the court found the identification testimony admissible

and not overly prejudicial, it should have instructed the jury, both contemporaneous with the testimony and at the conclusion of the evidence, it need not give any weight to Detective Sumption's identification and it must not draw any adverse inference from the fact Detective Sumption was a law enforcement officer.

¶ 59    The State asserts defendant has forfeited his argument by failing to raise it before the trial court. Defendant disagrees.

¶ 60    "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. The failure to do either results in forfeiture for purposes of appeal. *Id.* At no point during the proceedings below did defendant suggest the trial court was required to employ the procedural safeguards set forth in *Thompson* to Detective Sumption's identification of White in the audio recording of the jailhouse telephone call. Had defendant raised such an argument, the parties and the court could have addressed, for the first time, the applicability of *Thompson* to a law enforcement witnesses' identification of a third-party witness in an audio recording. Defendant's failure to raise his claim before the trial court results in its forfeiture for purposes of appeal.

¶ 61                    2. *White's Statements*

¶ 62    Defendant contends the trial court erroneously admitted certain hearsay and overly prejudicial statements from the audio recording of the jailhouse telephone call. Specifically, defendant complains about those statements where White (1) refers to defendant as "Nate" and (2) promises to speak to defendant's lawyer and testify on his behalf.

¶ 63                    a. White's Statements Referring to Defendant as "Nate"

¶ 64    Defendant complains White's statements referring to defendant as "Nate" were improper hearsay statements of identification.

¶ 65    The State asserts defendant has forfeited his argument by failing to raise it before the trial court. Defendant disagrees.

¶ 66    While defense counsel made a general hearsay objection to the admission of the entirety of the audio recording of the jailhouse telephone call, that objection was effectively overruled. The parties and the court then proceeded by meticulously going through the transcript of the audio recording and addressing the various statements and discussions contained therein. At no point during the proceedings below did defendant suggest the statements referencing "Nate" were improper hearsay statements of identification. Defendant's failure to raise his claim before the trial court results in its forfeiture for purposes of appeal.

¶ 67    Forfeiture aside, and even if the statements were improper, we find the admission of the statements was harmless. "[T]he admission of hearsay identification testimony is harmless error when it is merely cumulative or is supported by a positive identification and other corroborative circumstances." (Internal quotation marks omitted.) *People v. Yancy*, 368 Ill. App. 3d 381, 385, 858 N.E.2d 454, 458 (2005). Detective Sumption identified defendant's voice on the recording based on his prior experiences with him, and the statements made on the recording were corroborative of defendant's prior statements and actions. Any hearsay statement of identification from the audio recording was merely cumulative.

¶ 68    b. White's Statements Promising to Speak to Defendant's Lawyer and Testify

¶ 69    Defendant complains White's statements promising to speak to defendant's lawyer and testify were hearsay and overly prejudicial.

- 20 -

¶ 70 The State asserts the statements were not offered for their truth but rather to provide context for defendant's statements on the phone call and not overly prejudicial.

¶ 71 "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion." *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable. *Id.*

¶ 72 "Hearsay is an out-of-court statement offered to establish the truth of the matter asserted ***." *People v. Banks*, 237 Ill. 2d 154, 180, 934 N.E.2d 435, 449 (2010). "The determination of whether a statement constitutes inadmissible hearsay does not focus upon the substance of the statement, but rather the purpose for which the statement is being used." *People v. Williams*, 181 Ill. 2d 297, 313, 692 N.E.2d 1109, 1119 (1998). Here, the State offered the audio recording of the jailhouse phone call to show, in part, a consciousness of guilt as defendant was attempting to suborn perjury from White during the call. The statements where White promises to speak to defendant's lawyer and testify were not offered to show White would carry out her promises but rather to provide context as to how defendant expected the perjury would be carried out. We find the trial court did not abuse its discretion by finding the statements were admissible for a non-hearsay purpose.

¶ 73 Even where evidence is offered for a permissible purpose, it must still be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Defendant contends the statements promising to speak to defendant's lawyer and testify were overly prejudicial as they

constituted an unfulfilled promise to provide exonerating testimony. We disagree. First, we find no reasonable juror could find from a review of the audio recording White would have offered exculpatory testimony had she testified. Second, we find the case law cited by defendant to be distinguishable as each case dealt with a claim of ineffective assistance based on defense counsel's failure to present a promised witness or evidence. See *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 32, 41 N.E.3d 641; *People v. Bryant*, 391 Ill. App. 3d 228, 242, 907 N.E.2d 862, 874 (2009); *People v. Briones*, 352 Ill. App. 3d 913, 918, 816 N.E.2d 1120, 1124 (2004); *Saesee v. McDonald*, 725 F.3d 1045, 1048-49. We find the trial court did not abuse its discretion by finding the statements were not overly prejudicial.

¶ 74        3. *The Manner in Which the Trial Court Permitted the Jury to Listen*

*to the Audio Recording of the Jailhouse Phone Call During Deliberations*

¶ 75        Defendant contends the trial court erroneously permitted the jury to review the audio recording inside the courtroom during deliberations. Specifically, defendant contends, pursuant to *People v. Hollahan*, 2019 IL App (3d) 150556, allowing the jury to return to the courtroom to listen to the audio recording in the presence of the judge and the parties was reversable error as it amounted to an impermissible intrusion on the privacy of jury deliberations.

¶ 76        The State asserts defendant not only forfeited his claim by failing to raise it before the trial court but also invited any alleged error by agreeing to manner in which the court permitted the jury to review the audio recording. Defendant disagrees.

¶ 77        "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319, 802 N.E.2d 1185, 1190 (2003). While defendant, through defense counsel,

objected to the trial court replaying the audio recording, he agreed with the State's suggestion to have the jury be brought back into the courtroom to hear the replaying of the audio recording if the court overruled his objection. By agreeing to such a process, defendant's claim is barred under the doctrine of invited error. See *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 26, 20 N.E.3d 785 ("For the doctrine [of invited error] to apply, the defendant must affirmatively request or agree to proceed in a certain way.").

¶ 78      Defendant alternatively contends his trial counsel provided ineffective assistance by agreeing to manner in which the trial court permitted the jury to review the audio recording. The State disagrees.

¶ 79      This court recently had occasion to address a similar argument in *People v. Lewis*, 2019 IL App (4th) 150637-B, ¶¶ 102-07, 123 N.E.3d 1153. In that case, we found trial counsel's agreement to replay a 911 recording in the courtroom in lieu of sending it to the jury room during deliberations was "a reasonable strategic decision" that could not support a claim of ineffective assistance of counsel. *Id.* ¶ 104. Specifically, we found the decision to have the jury listen to the 911 recording once in the courtroom rather than repeatedly in the jury room was entirely reasonable given the fact nothing in the recording could have possibly benefited the defense. *Id.* ¶¶ 104-06.

¶ 80      In this case, defense counsel expressed concern with allowing the audio recording of the jailhouse telephone call to go "back to [the jury room for] them *** to play and stop and go forward with it." Counsel's concern with the jury having the audio recording to replay several times was entirely reasonable given the fact nothing in the recording could have possibly benefited the defense. We find no deficient performance by defense counsel, and we reject defendant's claim

- 23 -

of ineffective assistance. In reaching this decision, we recognize the Third District's recent decision in *Hollahan*, which is currently pending before the supreme court, is at odds with our decision in *Lewis*.

¶ 81                    B. The Admission of the Handwritten Jailhouse Note

¶ 82        Defendant argues the trial court erroneously admitted the irrelevant and overly prejudicial handwritten jailhouse note. The State disagrees.

¶ 83        Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Evidence of an attempt to suborn perjury is relevant as evincing consciousness of guilt. See *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 21, 13 N.E.3d 1280 (finding the defendant's attempt to intimidate witnesses and avoid police detection was indicative of his consciousness of guilt).

¶ 84        Defendant contends the jailhouse note was irrelevant as it related to an alleged attempt to secure a witness in another case in another county. We disagree. First, nothing in the note limits defendant's attempt to secure a witness for only the charge in Douglas County. Second, even if defendant only sought to secure the witness to testify in his favor for the charge in Douglas County, securing such a witness to testify in accordance with the account provided in the note could also benefit defendant in this case as it would provide a lawful explanation for possession of Davis's debit card, the fruit of the aggravated robbery. We find the trial court did not abuse its discretion by finding the note was relevant.

¶ 85        Again, even if evidence is sought to be introduced for a permissible purpose, it must still be excluded if "its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 86    Defendant contends any probative value of the jailhouse note was greatly outweighed by its prejudicial effect given the fact the note referenced the fact he was in custody in Douglas County for possession of a stolen credit card, which, according to defendant, would likely confuse the jury. We disagree. The jury heard evidence that, following the aggravated robbery in Champaign County, defendant used Davis's debit card at two locations in Douglas County and was then arrested and incarcerated in Douglas County. While the note referenced the charge in Douglas County, it referenced both Davis and the use of the card at the Baymont Inn, facts specifically related to this case. We find the trial court did not abuse its discretion by finding the note was not overly prejudicial.

¶ 87                              C. Harmless Error

¶ 88    Even if the audio recording of the jailhouse telephone call and the handwritten jailhouse note should have been excluded, we find any error in their admission was harmless because the other evidence against defendant was overwhelming.

¶ 89    Davis testified defendant agreed to drive him to his Tolono home following a social gathering at Laws's Tuscola apartment. Davis fell asleep in the car and later awoke in Champaign, where defendant requested gas money. Defendant took Davis to an ATM to retrieve the money, which was corroborated by surveillance video from an ATM in Champaign. Defendant then drove Davis to a parking lot, pulled a weapon resembling a firearm, and demanded Davis's possessions,

including his backpack, debit card, cell phone, and ID cards. Davis fled on foot to a nearby gas station, where he called his mother to pick him up. He then called the police upon returning home.

¶ 90        After the robbery, surveillance video and bank records showed defendant used Davis's debit card at a gas station in Tuscola. Bank records also showed Davis's debit card was used at a Baymont Inn in Tuscola. Police responded to the Baymont Inn and discovered defendant. Defendant was arrested with Davis's debit card on his person. Davis's backpack was near defendant when he was arrested. The backpack contained an Airsoft pistol, Davis's cell phone, Davis's ID cards, and a power bill in defendant's name. At no point did defendant provide any explanation for why several of Davis's belongings were in his possession when he was arrested.

¶ 91        Defendant's sole challenge to this evidence on appeal is to suggest Davis was not a credible witness as he choose to attend his cousin's Fourth of July gathering despite being on probation, denied drinking alcohol, and "inexplicably" went to a gas station rather than a nearby fire department after he was robbed. Initially, Davis did in fact provide an explanation for why he did not first stop at the fire department—he believed it was closed. We find defendant's other challenges to Davis's credibility to be tenuous and unsupported by the balance of the record. The evidence of defendant's guilt was overwhelming.

¶ 92                                III. CONCLUSION

¶ 93        We affirm the trial court's judgment.

¶ 94        Affirmed.