2021 IL App (1st) 190336-U

SIXTH DIVISION
June 30, 2021

No. 1-19-0336

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 01104 |
| | ) | |
| JAVON EVANS, | ) | Honorable |
| | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**O R D E R**

¶ 1   *Held*:  Defendant's conviction for armed robbery is affirmed where defendant failed to demonstrate that (1) his counsel's representations in opening argument regarding what the evidence would show constituted ineffective assistance of trial counsel or (2) it was an abuse of discretion for the trial court to refuse a requested pattern jury instruction.

¶ 2   A jury found defendant Javon Evans guilty of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2014)) and he was sentenced to 21 years in prison. On direct appeal, Mr. Evans argues that his trial counsel was ineffective for telling jurors during opening argument that they would hear testimony on cross-examination of the complaining witness that the altercation at issue

was a drug deal gone bad, rather than a robbery, when such testimony was never elicited. Mr. Evans also argues the trial court abused its discretion when it denied his request to instruct the jury in accordance with Illinois Pattern Jury Instruction, Criminal, No. 3.06-3.07 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.06-3.07), which applies where evidence is presented at trial that the defendant made statements "relating to the offense[s]." Mr. Evans asks us to reverse his conviction and remand for a new trial. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Mr. Evans was indicted on charges of armed robbery (720 ILCS 5/18-2 (West 2014)) and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6 (West 2014)). The State represented to the jurors in opening argument that the evidence presented at trial would show that on November 17, 2015, while dressed all in black and wearing ski masks, Mr. Evans and another unidentified individual attacked the victim, Terrion McCree, from behind and robbed him at gunpoint, taking from him $4 and a cell phone.

¶ 5     Mr. Evans's trial counsel urged the jurors to remember that this was "not evidence" but rather "a good story" that the State intended to present through witnesses. Defense counsel went on to highlight the lack of physical evidence in the case and, when the State unsuccessfully objected to his characterization of certain anticipated DNA evidence, stated that he did not believe he had misrepresented the evidence "but if it's not the evidence that comes out, disregard it."

¶ 6     Explaining that Mr. McCree had already given inconsistent accounts of what happened on the morning in question, Mr. Evans's lawyer then previewed for the jurors the version of events that he hoped to draw out from Mr. McCree on cross-examination:

"[W]hat the evidence is going to show is that this complaining witness gave different versions or stories about what allegedly transpired and I submit to you that when he takes

2

the stand here after my cross-examination he will give a different story because the truth in this case, judges, is what really was happening on November 17th, 2015.

It was Mr. Evans was in that area and you're going to hear about an attempt or transaction of some cannabis that Mr. McCree and Mr. Evans were exchanging cannabis for U.S. currency. And what Mr. McCree did, he had four one dollar bills wrapped up and gave it to Mr. Evans in exchange for some cannabis, some weed.

When [Mr.] Evans finds out that it isn't the $10 that he was asking for, then a fight ensued between Mr. Evans and Mr. McCree."

Defense counsel maintained that Mr. McCree's cell phone was not taken by force but fell to the ground during this altercation, where it was then retrieved by Mr. Evans. Counsel asked the jurors to listen to the evidence and find that the State's allegations were unsupported.

¶ 7    Five witnesses testified at trial for the State: Mr. McCree, Assistant State's Attorney (ASA) Becky Walters, Latoyea Sims, Park Forest police sergeant John Mannino, and Park Forest police detective Justin Rimovsky.

¶ 8    Mr. McCree acknowledged that he was on probation at the time of trial for identity theft. He went on to testify that he could not recall anything about the evening leading up to the incident or the incident itself. Mr. McCree answered "[d]on't remember" or "[d]on't know" to almost every one of the State's questions, including where he was on the day of the incident, what occurred, and if he remembered being interviewed following the incident by either Detective Rimovsky or ASA Walters. Mr. McCree could not remember giving a video-recorded statement in which he described the incident to ASA Walters. He agreed that he had viewed the statement the day before trial, but when asked if the video he was shown at that time depicted him "talking about an incident where [he] got robbed" or "talking about this incident," he again insisted that he "d[id]n't know."

¶ 9     On cross-examination, Mr. McCree acknowledged that he was subpoenaed to testify in this case and understood he would be arrested if he failed to appear as a witness. Defense counsel asked Mr. McCree if he used marijuana and he said that he did. Counsel did not question Mr. McCree, however, regarding whether the incident giving rise to this case began as a drug transaction or whether Mr. Evans picked Mr. McCree's cell phone up off of the ground during the ensuing altercation.

¶ 10    ASA Walters testified that in November 2015 she was assigned to the Felony Review Unit of the Cook County State's Attorney's Office, where, among other things, she interviewed witnesses to violent felonies. Mr. McCree, who had already told his version of events to Detective Rimovsky on the morning of the purported robbery, agreed to give a statement to ASA Walters the next day. Mr. McCree chose to have his statement video-recorded rather than handwritten.

¶ 11    Mr. McCree's recorded statement was played for the jury and consisted of the following narrative: at 1 a.m. on November 17, 2015, Mr. McCree was returning to his friend Devon Abercrombie's apartment, located at 3062 Western Avenue in Park Forest, to retrieve his cell phone charger and car keys, which he had left there earlier in the evening. As he approached the door, two African American men came up behind him, grabbed his arm, pointed a gun at him, and forced him to the ground. Both men were wearing black jogging suits, black hats, and ski masks. One man had a black revolver, the other a silver Glock 40. The men asked Mr. McCree, "what do you have on you," and told him, "give me what you got," before searching his person. They then repeatedly asked Mr. McCree, "who's in the house?" The first man fled between two buildings with Mr. McCree's debit card. The second took Mr. McCree's ID card, $4, and cell phone, held a gun to Mr. McCree's head, and told him not to move as he began kicking at Mr. Abercrombie's door. Mr. McCree said he heard the second man mumbling about how he was going "to kill

4

somebody" when he gained entry to the apartment.

¶ 12    According to Mr. McCree's statement, the police arrived and told the remaining assailant to freeze, at which point that individual fled and was pursued by the police on foot. Mr. McCree ran after them and at one point saw the man throw an object. Mr. McCree saw the officers detain the man, represented to them that he was one of the individuals who had robbed him, and was able to point the officers to his stolen cell phone, which had a "very particular" ringtone and could be heard ringing in the man's pocket. Mr. McCree's phone and $4 were recovered from the assailant's person. Mr. McCree never saw either of his assailants without a mask and did not recognize either man's voice. He identified a gun later retrieved by the officers from a nearby parking lot as one of the guns used during the robbery.

¶ 13    Detective Rimovsky testified that he interviewed Mr. McCree at the Park Forest Police Department in the early morning of November 17, 2015, at which time Mr. McCree provided him with an account of the incident that was substantially similar to his subsequent recorded statement.

¶ 14    Ms. Sims, a financial analyst, acknowledged that at the time of trial she was on probation for identity theft. Ms. Sims was living in a townhouse adjacent to 3062 Western Avenue. At approximately 1 a.m. on November 17, 2015, she was awakened by "cursing and loud bumping noises" which sounded to her "like someone was trying to kick in a door." Ms. Sims had a security system that allowed her to view live footage of the exterior of the building. She looked at the monitor and "saw a young man beating up a man on his porch and another person kicking out the door." Leaning out of her bedroom window for a better view, she saw "[a] fight on the porch and then a young man getting [dragged] off the porch onto [a] sidewalk." Both assailants were dressed all in black clothing. Ms. Sims saw one of the assailants "beating *** up" the person on the ground and testified that that assailant had a gun in his hand and "was going in [the victim's] pockets and

pointing the gun at him telling him he was going to kill him." Ms. Sims called 9-1-1, the police arrived, and the armed assailant fled, followed by an officer and the victim. The three eventually ran out of Ms. Sims's view.

¶ 15    Sergeant Mannino testified that he was dispatched to 3062 Western Avenue on November 17, 2015, on two separate 9-1-1 calls, the first referencing "men with guns trying to get into the unit of 3062 Western Avenue," and the second reporting "a ma[n] with a gun to another ma[n]'s head in front of 3062 Western Avenue."

¶ 16    At the scene, Sergeant Mannino heard yelling coming from the unit in question, approached the building from the side, and "observed a ma[n]"—who he identified at trial as Mr. Evans— "with a handgun in his hand pointing toward the ground." Sergeant Mannino's view was obstructed and he could not see what Mr. Evans was aiming at, only that the gun was "angled downward." Mr. Evans saw Sergeant Mannino and "immediately began to run northbound." Sergeant Mannino chased Mr. Evans for about 200 yards, never losing sight of him, and was followed in this chase by Mr. McCree who was "enthusiastically yelling at [the sergeant] to catch him." Sergeant Mannino acknowledged that parts of Mr. Evans's body were blocked from his view by vehicles during the chase.

¶ 17    With the assistance of another officer approaching from the north, Sergeant Mannino was able to detain Mr. Evans, who was wearing "a knit hat" and a "partial face mask *** around his neck." Mr. McCree's cell phone and $4 were found on Mr. Evans's person, and Mr. Evans carried neither a FOID card nor a concealed carry license.

¶ 18    Having seen Mr. Evans with a weapon but finding no weapon on his person, Sergeant Mannino and another officer proceeded to search the area with flashlights. At around 3:30 a.m., they found a loaded gun with scratches on it lying on the ground in the parking lot just west of

6

3062 Western Avenue, approximately 20-30 feet from the path Mr. Evans had taken. At no point did Mr. McCree tell Sergeant Mannino that Mr. Evans had thrown an object while he was being chased and Sergeant Mannino did not see Mr. Evans discard a gun. On cross examination, Sergeant Mannino acknowledged that there was gang activity in and around Park Forest but testified that he did not know what a "stash gun" was and had never encountered a situation in which a gang member had hidden a stash gun in a public place for later easy access.

¶ 19     The parties stipulated that no DNA recovered from the gun or fingerprints recovered from the crime scene could be matched to Mr. Evans. The State then rested.

¶ 20     Mr. Evans's motion for a directed verdict was denied and he also rested.

¶ 21     In its closing argument, the State maintained that the detailed version of events described by Mr. McCree to police officers and memorialized in his video-recorded statement was what really happened on November 17, 2015. That version was corroborated by the testimony of Ms. Sims, an independent bystander, and by Sergeant Mannino, who caught Mr. Evans in the act of robbing Mr. McCree at gunpoint. The State posited that all of the elements of armed robbery with a firearm had thus been proven beyond a reasonable doubt: while armed with a handgun, Mr. Evans had knowingly taken property from Mr. McCree by the use of force or a threat of the imminent use of force. The State then addressed Mr. McCree's testimony at trial, stating:

>     "So that brings me to a question you may all be asking yourselves. What do we make of Terrion McCree who came into this court and had a rash of memory problems the other day. He must have said I don't remember 200 plus times during his testimony.
>
>     Well, ladies and gentlemen, *** [t]he law accounts for the situation that happened in this courtroom where a witness for whatever reason is unwilling to cooperate or a victim is unwilling to cooperate. Maybe because they are scared, maybe because they don't want

[to] come into court, take the witness stand and point the finger at somebody. They don't

want to be a snitch, or maybe there is some other reason."

The State explained to the jurors that they could consider Mr. McCree's video-recorded statement as substantive evidence in this case.

¶ 22    Defense counsel began his own closing argument by reminding the jurors that it was the State's burden to prove Mr. Evans guilty beyond a reasonable doubt. Counsel noted that the State had listed a number of possible witnesses whom it had never called, including Mr. McCree's brother, who drove Mr. McCree back to his friend's house and who "supposedly saw this incident." Counsel asked the jury, "[w]here are they?" Counsel maintained that Mr. McCree and Ms. Sims were both liars and convicted felons, and that Sergeant Mannino honestly but mistakenly believed he saw Mr. Evans holding a gun when he arrived on the scene. Counsel pointed out that Ms. Sims described what she witnessed as a "fight," but asked the jury if a reasonable person in Mr. McCree's position would fight and then chase after someone who was armed with a handgun. Counsel also questioned whether a reasonable officer in Sergeant Mannino's position, chasing after what he was sure was an armed individual, would not have called out to that person to drop his weapon. Counsel told the jurors that a trial is like a buffet, and that they should go away with their hunger for the truth satisfied. He challenged each of them to write down 10 questions that were left unanswered in their minds at the conclusion of the trial.

¶ 23    At the jury instruction conference in this case, Mr. Evans's counsel requested IPI Criminal No. 3.06-3.07, which applies when evidence is presented that a defendant made "statement[s] relating to the offense[s] charged." Counsel argued that this instruction was necessary because several witnesses, including Mr. McCree in his videotaped interview, had referred to statements made by Mr. Evans during the purported robbery. The court denied this request, explaining:

8

"Counsel this is not the appropriate instruction for a statement made during the alleged offense. That is what you're asking for. He did not speak to the police and make any incriminating statements. There is not a third party that says your client made any incriminating statements relating to the offense.

You're asking for this to be given for statements made during the offense, and that is not what this instruction is for."

¶ 24    The jury found Mr. Evans guilty of armed robbery with a firearm and aggravated unlawful use of a weapon.

¶ 25    In his posttrial motion, Mr. Evans's counsel unsuccessfully argued that the verdict was against the manifest weight of the evidence, the trial court erred by admitting Mr. McCree's video-recorded statement into evidence without a proper foundation, and the court erred by refusing to instruct the jury in accordance with IPI Criminal No. 3.06-3.07. Mr. Evans's counsel also argued that he was entitled to a new trial based on the receipt of new evidence. He attached to his motion a handwritten affidavit his counsel had received from Mr. McCree, dated August 31, 2018, in which Mr. McCree attested that "the reason [he] said [he] didn't remember" anything at trial "was because the things [he] said in the taped conversation with police were not fully accurate, and [he] didn't want to be charged with perjury." Mr. McCree averred that before trial he "met with the State Attorney [*sic*] and told them what [he] was going to say." Mr. McCree concluded his affidavit by stating that he "really couldn't identify [Mr.] Evans as the person who had a gun."

¶ 26    The court held a three-day evidentiary hearing on the motion. Mr. McCree acknowledged that he had had no contact with anyone from the state's attorney's office until the day Mr. Evans's trial began, at which point he had told the State that he could not positively identify Mr. Evans as the person with the gun on November 17, 2015.

¶ 27    The court heard from ASA Patrick Waller, who met with Mr. McCree the day before he gave his trial testimony, at which point Mr. McCree repeatedly stated that he could not remember the events of November 17, 2015. ASA Waller testified that he played Mr. McCree's video-recorded statement for him, but that Mr. McCree still stated that he had no recollection of the events described in the video. At that point, ASA Waller intended to introduce Mr. McCree's video-recorded statement at trial if Mr. McCree's memory issues persisted on the stand. ASA Waller acknowledged on cross-examination that he did not "specifically" tell defense counsel at that time that Mr. McCree was saying he did not recall giving a video-recorded statement but said that he told counsel that Mr. McCree was now "stating that he [did not] recall the incident."

¶ 28    The trial court denied the motion for a new trial, concluding that Mr. McCree had "testified he didn't recall" and that this was "pretty much the same thing" he testified to at trial. In the court's view, "[t]his was a trial where everything was put before the trier[s] of fact" and they returned a verdict of guilty after an hour of deliberation.

¶ 29    The trial court merged the AUUW count into the armed robbery count and sentenced Mr. Evans to the minimum statutory sentence of 6 years in prison for armed robbery (730 ILCS 5/5-4.5-25(a) (West 2014)) plus a mandatory 15-year firearm enhancement (720 ILCS 5/18-2(b) (West 2014)). Mr. Evans now appeals.

¶ 30                                    II. JURISDICTION

¶ 31    A final judgment in this matter was entered on February 7, 2019, and Mr. Evans filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 32                                    III. ANALYSIS

¶ 33    Mr. Evans makes two arguments on appeal: (1) that his trial counsel was ineffective for failing to fulfil his promise, made during opening argument, that evidence supporting an alternative theory of the encounter between Mr. Evans and Mr. McCree would be presented and (2) that the trial court abused its discretion when it declined to give the jurors IPI Criminal 3.06-3.07, which applies when evidence has been presented that a defendant made "statement[s] relating to the offense[s]." We address each issue in turn.

¶ 34                        A. Ineffective Assistance of Counsel

¶ 35    Mr. Evans insists that his trial counsel was ineffective for promising during opening argument to present evidence that his interaction with Mr. McCree was a drug deal that escalated into a physical altercation, rather than an armed robbery, but never delivering on that promise. Mr. Evans maintains that this unfulfilled promise tended to strengthen the State's case, which otherwise had some weaknesses, and may have caused the jurors to question his counsel's credibility. The State argues in response that defense counsel's performance was the result of a legitimate change in trial strategy prompted by circumstances that were not completely foreseeable at the outset of the trial and that, even if objectively unreasonable, could not have prejudiced Mr. Evans where the evidence of his guilt was overwhelming.

¶ 36    A criminal defendant has a right to effective assistance of counsel under both the United States Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To prevail on a claim of ineffective assistance of trial counsel, a defendant must demonstrate that his or her counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Deficient performance is that which is "objectively

unreasonable under prevailing professional norms." *Id.* Importantly, there is "a strong presumption that counsel's conduct fell into a wide range of reasonable representation" and that, "under the circumstances, the challenged action might be considered sound trial strategy." *People v. Cloutier*, 191 Ill. 2d 392, 402 (2000). This presumption is overcome "if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009). To demonstrate prejudice, a defendant must further establish "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Briones*, 352 Ill. App. 3d, 913, 917 (2004). When a claim of ineffective assistance is raised for the first time on appeal, our review is *de novo. People v. Bustos*, 2020 IL App (2d) 170497, ¶ 87.

¶ 37    Here, Mr. Evans has failed to show that his counsel's performance was deficient. We must consider the challenged portions of defense counsel's opening argument in their proper context. *Cf. People v. Caffey*, 205 Ill. 2d 52, 104 (2002) (noting that, in the context of a claim of prosecutorial misconduct, the arguments "of both the State and the defendant must be examined in their entirety, and the complained-of remarks must be placed in their proper context"). Here, the trial court instructed the jury at the outset that "[o]pening statements are not evidence" but "merely statements by the lawyers as to what they expect the evidence to prove." Defense counsel reiterated this point, reminding the jurors that what the State had just told them was "not evidence" but "a good story" that the State would try to present through the testimony of witnesses. And when the State objected to the way defense counsel characterized the DNA evidence in this case, counsel stated plainly, in the jury's presence, that he disagreed but "if it's not the evidence that comes out,

disregard it." At this point, we believe it was clear to the jurors that the lawyers' statements represented only what they *hoped* the evidence would show. Counsel went on to explain to the jurors that the complaining witness in this case, Mr. McCree, had already given inconsistent accounts of what happened on the morning in question. He then summarized for the jurors the testimony he hoped to elicit from Mr. McCree on cross-examination—that the whole incident was not an armed robbery but a marijuana transaction that had escalated into a physical altercation. In context, it is apparent that counsel intended to convey to the jury that Mr. McCree was an unpredictable witness—the State hoped he would say one thing on the stand and the defense quite another.

¶ 38 This was not the sort of unfulfilled promise to produce independently exonerating evidence that this court deemed objectively unreasonable in the cases that Mr. Evans relies on. Counsel in *Briones*, 352 Ill. App. 3d at 913, 915, for example, promised the jury that his client, whom he acknowledged had "no obligation to testify," would nevertheless "get up *** on this witness stand" and "subject himself to rigorous cross-examination *** because he's going to tell you the truth." Despite these bold promises, the defendant in *Briones* never did take the stand. *Id.* at 916. This court reasoned that the presumption of sound trial strategy was overcome because "in no sense could it serve the defendant's interests" for his counsel to renege on such a promise. *Id.* at 919. The *Briones* court explained that "[a] broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made." (Internal quotation marks omitted.) *Id.* at 918.

¶ 39 Counsel in *Bryant*, 391 Ill. App. 3d at 230, likewise promised the jury that, "make no bones about it," his two clients would take the stand because "[w]e know you want to hear it from their mouths." Counsel further represented that the physical evidence would support the codefendants'

account that two other individuals had committed the murder in question while his clients were sleeping. *Id.* The lawyer in *Bryant* had promised the jury specific, independent evidence supporting his clients' innocence, including his clients' own testimony. And despite the apparent availability of witnesses whose testimony would have supported the defense's theory, that theory "was left unexplored and undeveloped" at trial. *Id.* at 240. "[F]ailing to adduce available evidence that would support an otherwise unsupported defense" was, we concluded, an unsound and unreasonable trial strategy. *Id.* at 241. That is not what happened here.

¶ 40    Mr. Evans is correct that, beyond confirming that Mr. McCree used marijuana, his trial counsel made no effort to cross-examine Mr. McCree to establish that he had in fact been engaged in a drug transaction with Mr. Evans at the time of the purported robbery. At this point, however, Mr. McCree had already made quite clear—in response to dozens and dozens of questions by the State, and after he was presented with his own video-recorded statement to refresh his recollection—that he did not recall and would offer no information about the events in question. Defense counsel gave Mr. McCree an opportunity to refute his recorded statement, on the basis that he had not sworn to tell the truth before providing it, but Mr. McCree continued to maintain that he remembered nothing. We agree with the State that the failure to ask further questions was not ineffective assistance, as counsel lacked a proper foundation to question Mr. McCree further regarding a purported drug transaction and to do so would have been a waste of time.

¶ 41    In sum, Mr. Evans's counsel promised the jury neither that he would put his own client on the stand nor that specific independent evidence of his theory of the case would be presented. Instead, counsel told the jury the version of events that he hoped to draw out from an unpredictable witness on cross-examination. And when his efforts to do so were frustrated, counsel reasonably changed tack. See *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 50 (noting that a decision "to

abandon a strategy during trial may be reasonable based on the circumstances or based on unexpected events").

¶ 42   In his reply brief, Mr. Evans insists that this is not a case in which counsel had to change his strategy during trial because his counsel knew in advance of trial what Mr. McCree would say on the witness stand. We believe this overstates the matter. Counsel knew that Mr. McCree had made a video-recorded statement on which the State's theory of the case was based but that, on the day the trial began, Mr. McCree made it clear that he was no longer cooperating with the State and was instead claiming he could not remember the events he had described. This did not mean that counsel knew in any detail what this witness would say on the stand. To the contrary, since counsel knew that Mr. McCree was backing away from the story he had initially told the police, counsel could have reasonably seen the possibility of establishing a different version of events on cross-examination.

¶ 43   "[A] defendant is entitled to a fair trial, not a perfect one," and "the right to effective assistance of counsel refers to competent, not perfect, representation." *Briones*, 352 Ill. App. 3d at 917. As the State points out, overpromising in opening argument is not *per se* ineffective assistance of counsel. *Talbert*, 2018 IL App (1st) 160157, ¶ 50. Instead, we must consider the "totality of counsel's conduct." *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 24 (concluding that, apart from overpromising what evidence would be established at trial, defense counsel had otherwise rendered competent representation). Here, as summarized in his closing argument, Mr. Evans's counsel competently attacked the credibility of the State's witnesses, questioned the reasonableness or likelihood of certain aspects of those witnesses' accounts, and repeatedly drew the jury's attention to the lack of physical evidence in this case. Going into trial, there was a chance—though perhaps a slim one—that counsel might also get the State's defecting witness to

relate a more helpful version of events on cross-examination. In our view, counsel presented this possibility to the jury for what it was, made reasonable efforts to draw out the hoped-for testimony, and abandoned the strategy when it became clear it would bear no fruit. It is possible that Mr. Evans would have been better off if his counsel had never mentioned the alternative theory, but it is also possible that he would not have been. As Mr. Evans himself acknowledges on appeal, "[m]ost of the State's evidence introduced to prove armed robbery was equally consistent with counsel's theory in opening statement that this was a drug deal gone wrong."

¶ 44 Moreover, in addition to rejecting Mr. Evans's argument that his counsel's performance was deficient, we also agree with the State that Mr. Evans could demonstrate no resulting prejudice. The jury in this case had every reason to believe the account of an armed robbery that Mr. McCree provided to police officers just hours after the events in question and that was memorialized just one day later in a video-recorded statement. That straightforward account was detailed and coherent. It was also significantly corroborated by the testimony of Ms. Sims, a neutral bystander, and Sergeant Mannino, who arrived on the scene while the events Mr. McCree described were still unfolding. We see no reasonable probability that, if counsel had elected not to mention the theory of a drug deal gone bad at all in his opening argument, the result of the proceeding would have been any different.

¶ 45 Mr. Evans has failed to establish that he received ineffective assistance of trial counsel.

¶ 46 B. The Trial Court's Refusal to Give IPI Criminal No. 3.06-3.07

¶ 47 Mr. Evans also argues that the trial court abused its discretion when it refused to instruct the jury in accordance with IPI Criminal No. 3.06-3.07, which provides as follows:

"You have before you evidence that [(the) (a)] defendant made [a] statement[s] relating to the offense[s] charged in the [(indictment) (information) (complaint)]. It is for

16

you to determine [whether the defendant made the statement[s], and, if so,] what weight should be given to the statement[s]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

The court concluded that this instruction applies only to incriminating statements made to the police or a third party *after* an offense is complete and not to statements a defendant may have made during the offense. Mr. Evans maintains that it is the incriminating nature of the statements, and not when the statements were made, that matters. He urges us to conclude that the trial court's reading of the instruction was an unreasonably narrow one.

¶ 48    "The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence presented." *Martoccio v. Western Restaurants, Inc.*, 286 Ill. App. 3d 390, 392 (1997). Whether to instruct jurors on an issue is a matter within the court's sound discretion. *Id.* The court does not abuse that discretion "so long as, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." (Internal quotation marks omitted.) *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 39.

¶ 49    Some months before Mr. Evans's trial, this court had an occasion to consider the applicability of IPI Criminal 3.06-3.07 in *People v. James*, 2017 IL App (1st) 143391. The State's theory of the case in *James* was that the defendant, with three other individuals, broke into the victims' apartment to rob them of drugs and money. *Id.* ¶ 7. The victims testified that at various points the masked intruders issued orders and threats, demanding that the victims get out of bed or lie on the floor and keep their heads down, ordering a female victim to take her clothes off, and threatening to stab the victims if they did not reveal where drugs and money were hidden. *Id.* ¶¶ 12-15. One of the assailants also made a number of vulgar comments to a female victim as he sexually assaulted her. *Id.* ¶¶ 12, 16-17. On appeal, the defendant in *James* argued that the trial

17

court had erred by failing to include certain bracketed language when it gave IPI Criminal 3.06-3.07 to the jury. *Id.* ¶ 112. This court rejected that argument on the basis that it had been error—albeit harmless error—for the court to even give the instruction in the first place. *Id.* ¶¶ 137, 139. Noting that "the instruction was given based solely on the threats and commands that the codefendants directed at the victims throughout the home invasion," the *James* court concluded that "[n]o self-incriminating *statements* *** either to law enforcement or any other third-parties, [had been] put before the jury." (Emphasis added.) *Id.* ¶ 137. To qualify as a "statement," the court reasoned, "an utterance or writing must make a claim about a matter of fact," expressing "a proposition that is either true or false." *Id.* ¶ 119. Following a thorough analysis of the instruction's history and origins (*id.* ¶¶ 120-133), the *James* court concluded that IPI Criminal No. 3.06-3.07 applies only "to a defendant's self-incriminating statements—confessions, admissions, or false exculpatory statements—relating to the charged offense(s)" and not to "nondeclarative utterances" like threats and commands. *Id.* ¶¶ 120, 133. Although, as Mr. Evans points out, we are not bound to follow the *James* court's holding, we find its analysis persuasive.

¶ 50     The trial court did not abuse its discretion in failing to give IPI Criminal 3.06-3.07. Just as in *James*, the instruction had no applicability here.

¶ 51                                    IV. CONCLUSION

¶ 52     For the foregoing reasons, we affirm the judgment of the trial court.

¶ 53     Affirmed.

18